(Slip Opinion)     OCTOBER TERM, 2015     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WILLIAMS *v.* PENNSYLVANIA

### CERTIORARI TO THE SUPREME COURT OF PENNSYLVANIA

No. 15–5040.   Argued February 29, 2016—Decided June 9, 2016

Petitioner Williams was convicted of the 1984 murder of Amos Norwood and sentenced to death.  During the trial, the then-district attorney of Philadelphia, Ronald Castille, approved the trial prosecutor's request to seek the death penalty against Williams.  Over the next 26 years, Williams's conviction and sentence were upheld on direct appeal, state postconviction review, and federal habeas review.   In 2012, Williams filed a successive petition pursuant to Pennsylvania's Post Conviction Relief Act (PCRA), arguing that the prosecutor had obtained false testimony from his codefendant and suppressed material, exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U. S. 83.  Finding that the trial prosecutor had committed *Brady* violations, the PCRA court stayed Williams's execution and ordered a new sentencing hearing.  The Commonwealth asked the Pennsylvania Supreme Court, whose chief justice was former District Attorney Castille, to vacate the stay.  Williams filed a response, along with a motion asking Chief Justice Castille to recuse himself or, if he declined to do so, to refer the motion to the full court for decision. Without explanation, the chief justice denied Williams's motion for recusal and the request for its referral.  He then joined the State Supreme Court opinion vacating the PCRA court's grant of penalty-phase relief and reinstating Williams's death sentence.  Two weeks later, Chief Justice Castille retired from the bench.

*Held*:

1. Chief Justice Castille's denial of the recusal motion and his subsequent judicial participation violated the Due Process Clause of the Fourteenth Amendment.  Pp. 5–12.

(a) The Court's due process precedents do not set forth a specific test governing recusal when a judge had prior involvement in a case as a prosecutor; but the principles on which these precedents rest dic-

tate the rule that must control in the circumstances here: Under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case. The Court applies an objective standard that requires recusal when the likelihood of bias on the part of the judge "is too high to be constitutionally tolerable." *Caperton* v. *A. T. Massey Coal Co.*, 556 U. S. 868, 872. A constitutionally intolerable probability of bias exists when the same person serves as both accuser and adjudicator in a case. See *In re Murchison*, 349 U. S. 133, 136–137. No attorney is more integral to the accusatory process than a prosecutor who participates in a major adversary decision. As a result, a serious question arises as to whether a judge who has served as an advocate for the State in the very case the court is now asked to adjudicate would be influenced by an improper, if inadvertent, motive to validate and preserve the result obtained through the adversary process. In these circumstances, neither the involvement of multiple actors in the case nor the passage of time relieves the former prosecutor of the duty to withdraw in order to ensure the neutrality of the judicial process in determining the consequences his or her own earlier, critical decision may have set in motion. Pp. 5–8.

(b) Because Chief Justice Castille's authorization to seek the death penalty against Williams amounts to significant, personal involvement in a critical trial decision, his failure to recuse from Williams's case presented an unconstitutional risk of bias. The decision to pursue the death penalty is a critical choice in the adversary process, and Chief Justice Castille had a significant role in this decision. Without his express authorization, the Commonwealth would not have been able to pursue a death sentence against Williams. Given the importance of this decision and the profound consequences it carries, a responsible prosecutor would deem it to be a most significant exercise of his or her official discretion. The fact that many jurisdictions, including Pennsylvania, have statutes and professional codes of conduct that already require recusal under the circumstances of this case suggests that today's decision will not occasion a significant change in recusal practice. Pp. 9–12.

2. An unconstitutional failure to recuse constitutes structural error that is "not amenable" to harmless-error review, regardless of whether the judge's vote was dispositive, *Puckett* v. *United States*, 556 U. S. 129, 141. Because an appellate panel's deliberations are generally confidential, it is neither possible nor productive to inquire whether the jurist in question might have influenced the views of his or her colleagues during the decisionmaking process. Indeed, one purpose of judicial confidentiality is to ensure that jurists can reexamine old

ideas and suggest new ones, while both seeking to persuade and being open to persuasion by their colleagues. It does not matter whether the disqualified judge's vote was necessary to the disposition of the case. The fact that the interested judge's vote was not dispositive may mean only that the judge was successful in persuading most members of the court to accept his or her position—an outcome that does not lessen the unfairness to the affected party. A multimember court must not have its guarantee of neutrality undermined, for the appearance of bias demeans the reputation and integrity not just of one jurist, but of the larger institution of which he or she is a part. Because Chief Justice Castille's participation in Williams's case was an error that affected the State Supreme Court's whole adjudicatory framework below, Williams must be granted an opportunity to present his claims to a court unburdened by any "possible temptation . . . not to hold the balance nice, clear and true between the State and the accused," *Tumey* v. *Ohio*, 273 U. S. 510, 532. Pp. 12–14.

\_\_ Pa. \_\_, 105 A. 3d 1234, vacated and remanded.

KENNEDY, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which ALITO, J., joined. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–5040

### TERRANCE WILLIAMS, PETITIONER *v.* PENNSYLVANIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF PENNSYLVANIA, EASTERN DISTRICT

[June 9, 2016]

JUSTICE KENNEDY delivered the opinion of the Court.

In this case, the Supreme Court of Pennsylvania vacated the decision of a postconviction court, which had granted relief to a prisoner convicted of first-degree murder and sentenced to death. One of the justices on the State Supreme Court had been the district attorney who gave his official approval to seek the death penalty in the prisoner's case. The justice in question denied the prisoner's motion for recusal and participated in the decision to deny relief. The question presented is whether the justice's denial of the recusal motion and his subsequent judicial participation violated the Due Process Clause of the Fourteenth Amendment.

This Court's precedents set forth an objective standard that requires recusal when the likelihood of bias on the part of the judge "'is too high to be constitutionally tolerable.'" *Caperton* v. *A. T. Massey Coal Co.*, 556 U. S. 868, 872 (2009) (quoting *Withrow* v. *Larkin*, 421 U. S. 35, 47 (1975)). Applying this standard, the Court concludes that due process compelled the justice's recusal.

I

Petitioner is Terrance Williams. In 1984, soon after Williams turned 18, he murdered 56-year-old Amos Norwood in Philadelphia. At trial, the Commonwealth presented evidence that Williams and a friend, Marc Draper, had been standing on a street corner when Norwood drove by. Williams and Draper requested a ride home from Norwood, who agreed. Draper then gave Norwood false directions that led him to drive toward a cemetery. Williams and Draper ordered Norwood out of the car and into the cemetery. There, the two men tied Norwood in his own clothes and beat him to death. Testifying for the Commonwealth, Draper suggested that robbery was the motive for the crime. Williams took the stand in his own defense, stating that he was not involved in the crime and did not know the victim.

During the trial, the prosecutor requested permission from her supervisors in the district attorney's office to seek the death penalty against Williams. To support the request, she prepared a memorandum setting forth the details of the crime, information supporting two statutory aggravating factors, and facts in mitigation. After reviewing the memorandum, the then-district attorney of Philadelphia, Ronald Castille, wrote this note at the bottom of the document: "Approved to proceed on the death penalty." App. 426a.

During the penalty phase of the trial, the prosecutor argued that Williams deserved a death sentence because he killed Norwood "'for no other reason but that a kind man offered him a ride home.'" Brief for Petitioner 7. The jurors found two aggravating circumstances: that the murder was committed during the course of a robbery and that Williams had a significant history of violent felony convictions. That criminal history included a previous conviction for a murder he had committed at age 17. The jury found no mitigating circumstances and sentenced

Williams to death. Over a period of 26 years, Williams's conviction and sentence were upheld on direct appeal, state postconviction review, and federal habeas review.

In 2012, Williams filed a successive petition pursuant to Pennsylvania's Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. §9541 *et seq.* (2007). The petition was based on new information from Draper, who until then had refused to speak with Williams's attorneys. Draper told Williams's counsel that he had informed the Commonwealth before trial that Williams had been in a sexual relationship with Norwood and that the relationship was the real motive for Norwood's murder. According to Draper, the Commonwealth had instructed him to give false testimony that Williams killed Norwood to rob him. Draper also admitted he had received an undisclosed benefit in exchange for his testimony: the trial prosecutor had promised to write a letter to the state parole board on his behalf. At trial, the prosecutor had elicited testimony from Draper indicating that his only agreement with the prosecution was to plead guilty in exchange for truthful testimony. No mention was made of the additional promise to write the parole board.

The Philadelphia Court of Common Pleas, identified in the proceedings below as the PCRA court, held an evidentiary hearing on Williams's claims. Williams alleged in his petition that the prosecutor had procured false testimony from Draper and suppressed evidence regarding Norwood's sexual relationship with Williams. At the hearing, both Draper and the trial prosecutor testified regarding these allegations. The PCRA court ordered the district attorney's office to produce the previously undisclosed files of the prosecutor and police. These documents included the trial prosecutor's sentencing memorandum, bearing then-District Attorney Castille's authorization to pursue the death penalty. Based on the Commonwealth's files and the evidentiary hearing, the PCRA court found

that the trial prosecutor had suppressed material, exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U. S. 83 (1963), and engaged in "prosecutorial gamesmanship." App. 168a. The court stayed Williams's execution and ordered a new sentencing hearing.

Seeking to vacate the stay of execution, the Commonwealth submitted an emergency application to the Pennsylvania Supreme Court. By this time, almost three decades had passed since Williams's prosecution. Castille had been elected to a seat on the State Supreme Court and was serving as its chief justice. Williams filed a response to the Commonwealth's application. The disclosure of the trial prosecutor's sentencing memorandum in the PCRA proceedings had alerted Williams to Chief Justice Castille's involvement in the decision to seek a death sentence in his case. For this reason, Williams also filed a motion asking Chief Justice Castille to recuse himself or, if he declined to do so, to refer the recusal motion to the full court for decision. The Commonwealth opposed Williams's recusal motion. Without explanation, Chief Justice Castille denied the motion for recusal and the request for its referral. Two days later, the Pennsylvania Supreme Court denied the application to vacate the stay and ordered full briefing on the issues raised in the appeal. The State Supreme Court then vacated the PCRA court's order granting penalty-phase relief and reinstated Williams's death sentence. Chief Justice Castille and Justices Baer and Stevens joined the majority opinion written by Justice Eakin. Justices Saylor and Todd concurred in the result without issuing a separate opinion. See ___ Pa. ___, ___, 105 A. 3d 1234, 1245 (2014).

Chief Justice Castille authored a concurrence. He lamented that the PCRA court had "lost sight of its role as a neutral judicial officer" and had stayed Williams's execution "for no valid reason." *Id.*, at ___, 105 A. 3d, at 1245. "[B]efore condemning officers of the court," the chief jus-

tice stated, "the tribunal should be aware of the substantive status of *Brady* law," which he believed the PCRA court had misapplied. *Id.*, at \_\_\_, 105 A. 3d, at 1246. In addition, Chief Justice Castille denounced what he perceived as the "obstructionist anti-death penalty agenda" of Williams's attorneys from the Federal Community Defender Office. *Ibid.* PCRA courts "throughout Pennsylvania need to be vigilant and circumspect when it comes to the activities of this particular advocacy group," he wrote, lest Defender Office lawyers turn postconviction proceedings "into a circus where [they] are the ringmasters, with their parrots and puppets as a sideshow." *Id.*, at \_\_\_, 105 A. 3d, at 1247.

Two weeks after the Pennsylvania Supreme Court decided Williams's case, Chief Justice Castille retired from the bench. This Court granted Williams's petition for certiorari. 576 U. S. \_\_\_ (2015).

## II

### A

Williams contends that Chief Justice Castille's decision as district attorney to seek a death sentence against him barred the chief justice from later adjudicating Williams's petition to overturn that sentence. Chief Justice Castille, Williams argues, violated the Due Process Clause of the Fourteenth Amendment by acting as both accuser and judge in his case.

The Court's due process precedents do not set forth a specific test governing recusal when, as here, a judge had prior involvement in a case as a prosecutor. For the reasons explained below, however, the principles on which these precedents rest dictate the rule that must control in the circumstances here. The Court now holds that under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regard-

ing the defendant's case.

Due process guarantees "an absence of actual bias" on the part of a judge. *In re Murchison*, 349 U. S. 133, 136 (1955). Bias is easy to attribute to others and difficult to discern in oneself. To establish an enforceable and workable framework, the Court's precedents apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present. The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, "the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Caperton*, 556 U. S., at 881. Of particular relevance to the instant case, the Court has determined that an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case. See *Murchison*, 349 U. S., at 136–137. This objective risk of bias is reflected in the due process maxim that "no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome." *Id.*, at 136.

The due process guarantee that "no man can be a judge in his own case" would have little substance if it did not disqualify a former prosecutor from sitting in judgment of a prosecution in which he or she had made a critical decision. This conclusion follows from the Court's analysis in *In re Murchison*. That case involved a "one-man judge-grand jury" proceeding, conducted pursuant to state law, in which the judge called witnesses to testify about suspected crimes. *Id.*, at 134. During the course of the examinations, the judge became convinced that two witnesses were obstructing the proceeding. He charged one witness with perjury and then, a few weeks later, tried and convicted him in open court. The judge charged the other witness with contempt and, a few days later, tried and convicted him as well. This Court overturned the convic-

tions on the ground that the judge's dual position as ac-
cuser and decisionmaker in the contempt trials violated
due process: "Having been a part of [the accusatory] pro-
cess a judge cannot be, in the very nature of things, wholly
disinterested in the conviction or acquittal of those ac-
cused." *Id.*, at 137.

No attorney is more integral to the accusatory process
than a prosecutor who participates in a major adversary
decision. When a judge has served as an advocate for the
State in the very case the court is now asked to adjudicate,
a serious question arises as to whether the judge, even
with the most diligent effort, could set aside any personal
interest in the outcome. There is, furthermore, a risk that
the judge "would be so psychologically wedded" to his or
her previous position as a prosecutor that the judge
"would consciously or unconsciously avoid the appearance
of having erred or changed position." *Withrow*, 421 U. S.,
at 57. In addition, the judge's "own personal knowledge
and impression" of the case, acquired through his or her
role in the prosecution, may carry far more weight with
the judge than the parties' arguments to the court. *Mur-
chison*, *supra*, at 138; see also *Caperton*, *supra*, at 881.

Pennsylvania argues that *Murchison* does not lead to
the rule that due process requires disqualification of a
judge who, in an earlier role as a prosecutor, had signifi-
cant involvement in making a critical decision in the case.
The facts of *Murchison*, it should be acknowledged, differ
in many respects from a case like this one. In *Murchison*,
over the course of several weeks, a single official (the so-
called judge-grand jury) conducted an investigation into
suspected crimes; made the decision to charge witnesses
for obstruction of that investigation; heard evidence on the
charges he had lodged; issued judgments of conviction; and
imposed sentence. See 349 U. S., at 135 (petitioners ob-
jected to "trial before the judge who was at the same time
the complainant, indicter and prosecutor"). By contrast, a

judge who had an earlier involvement in a prosecution might have been just one of several prosecutors working on the case at each stage of the proceedings; the prosecutor's immediate role might have been limited to a particular aspect of the prosecution; and decades might have passed before the former prosecutor, now a judge, is called upon to adjudicate a claim in the case.

These factual differences notwithstanding, the constitutional principles explained in *Murchison* are fully applicable where a judge had a direct, personal role in the defendant's prosecution. The involvement of other actors and the passage of time are consequences of a complex criminal justice system, in which a single case may be litigated through multiple proceedings taking place over a period of years. This context only heightens the need for objective rules preventing the operation of bias that otherwise might be obscured. Within a large, impersonal system, an individual prosecutor might still have an influence that, while not so visible as the one-man grand jury in *Murchison*, is nevertheless significant. A prosecutor may bear responsibility for any number of critical decisions, including what charges to bring, whether to extend a plea bargain, and which witnesses to call. Even if decades intervene before the former prosecutor revisits the matter as a jurist, the case may implicate the effects and continuing force of his or her original decision. In these circumstances, there remains a serious risk that a judge would be influenced by an improper, if inadvertent, motive to validate and preserve the result obtained through the adversary process. The involvement of multiple actors and the passage of time do not relieve the former prosecutor of the duty to withdraw in order to ensure the neutrality of the judicial process in determining the consequences that his or her own earlier, critical decision may have set in motion.

## B

This leads to the question whether Chief Justice Castille's authorization to seek the death penalty against Williams amounts to significant, personal involvement in a critical trial decision. The Court now concludes that it was a significant, personal involvement; and, as a result, Chief Justice Castille's failure to recuse from Williams's case presented an unconstitutional risk of bias.

As an initial matter, there can be no doubt that the decision to pursue the death penalty is a critical choice in the adversary process. Indeed, after a defendant is charged with a death-eligible crime, whether to ask a jury to end the defendant's life is one of the most serious discretionary decisions a prosecutor can be called upon to make.

Nor is there any doubt that Chief Justice Castille had a significant role in this decision. Without his express authorization, the Commonwealth would not have been able to pursue a death sentence against Williams. The importance of this decision and the profound consequences it carries make it evident that a responsible prosecutor would deem it to be a most significant exercise of his or her official discretion and professional judgment.

Pennsylvania nonetheless contends that Chief Justice Castille in fact did not have significant involvement in the decision to seek a death sentence against Williams. The chief justice, the Commonwealth points out, was the head of a large district attorney's office in a city that saw many capital murder trials. Tr. of Oral Arg. 36. According to Pennsylvania, his approval of the trial prosecutor's request to pursue capital punishment in Williams's case amounted to a brief administrative act limited to "the time it takes to read a one-and-a-half-page memo." *Ibid.* In this Court's view, that characterization cannot be credited. The Court will not assume that then-District Attorney Castille treated so major a decision as a perfunctory task

requiring little time, judgment, or reflection on his part.

Chief Justice Castille's own comments while running for judicial office refute the Commonwealth's claim that he played a mere ministerial role in capital sentencing decisions. During the chief justice's election campaign, multiple news outlets reported his statement that he "sent 45 people to death rows" as district attorney. Seelye, Castille Keeps His Cool in Court Run, Philadelphia Inquirer, Apr. 30, 1993, p. B1; see also, *e.g.,* Brennan, State Voters Must Choose Next Supreme Court Member, Legal Intelligencer, Oct. 28, 1993, pp. 1, 12. Chief Justice Castille's willingness to take personal responsibility for the death sentences obtained during his tenure as district attorney indicate that, in his own view, he played a meaningful role in those sentencing decisions and considered his involvement to be an important duty of his office.

Although not necessary to the disposition of this case, the PCRA court's ruling underscores the risk of permitting a former prosecutor to be a judge in what had been his or her own case. The PCRA court determined that the trial prosecutor—Chief Justice Castille's former subordinate in the district attorney's office—had engaged in multiple, intentional *Brady* violations during Williams's prosecution. App. 131–145, 150–154. While there is no indication that Chief Justice Castille was aware of the alleged prosecutorial misconduct, it would be difficult for a judge in his position not to view the PCRA court's findings as a criticism of his former office and, to some extent, of his own leadership and supervision as district attorney.

The potential conflict of interest posed by the PCRA court's findings illustrates the utility of statutes and professional codes of conduct that "provide more protection than due process requires." *Caperton*, 556 U. S., at 890. It is important to note that due process "demarks only the outer boundaries of judicial disqualifications." *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813, 828 (1986). Most ques-

tions of recusal are addressed by more stringent and detailed ethical rules, which in many jurisdictions already require disqualification under the circumstances of this case. See Brief for American Bar Association as *Amicus Curiae* 5, 11–14; see also ABA Model Code of Judicial Conduct Rules 2.11(A)(1), (A)(6)(b) (2011) (no judge may participate "in any proceeding in which the judge's impartiality might reasonably be questioned," including where the judge "served in governmental employment, and in such capacity participated personally and substantially as a lawyer or public official concerning the proceeding"); ABA Center for Professional Responsibility Policy Implementation Comm., Comparison of ABA Model Judicial Code and State Variations (Dec. 14, 2015), available at http://www.americanbar.org/content/dam/aba/administrative/ professional_responsibility/2_11.authcheckdam.pdf (as last visited June 7, 2016) (28 States have adopted language similar to ABA Model Judicial Code Rule 2.11); 28 U. S. C. §455(b)(3) (recusal required where judge "has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding"). At the time Williams filed his recusal motion with the Pennsylvania Supreme Court, for example, Pennsylvania's Code of Judicial Conduct disqualified judges from any proceeding in which "they served as a lawyer in the matter in controversy, or a lawyer with whom they previously practiced law served during such association as a lawyer concerning the matter. . . ." Pa. Code of Judicial Conduct, Canon 3C (1974, as amended). The fact that most jurisdictions have these rules in place suggests that today's decision will not occasion a significant change in recusal practice.

Chief Justice Castille's significant, personal involvement in a critical decision in Williams's case gave rise to an unacceptable risk of actual bias. This risk so endangered the appearance of neutrality that his participation in the

case "must be forbidden if the guarantee of due process is to be adequately implemented." *Withrow*, 421 U. S., at 47.

### III

Having determined that Chief Justice Castille's participation violated due process, the Court must resolve whether Williams is entitled to relief. In past cases, the Court has not had to decide the question whether a due process violation arising from a jurist's failure to recuse amounts to harmless error if the jurist is on a multimember court and the jurist's vote was not decisive. See *Lavoie*, *supra*, at 827–828 (addressing "the question whether a decision of a multimember tribunal must be vacated because of the participation of one member who had an interest in the outcome of the case," where that member's vote was outcome determinative). For the reasons discussed below, the Court holds that an unconstitutional failure to recuse constitutes structural error even if the judge in question did not cast a deciding vote.

The Court has little trouble concluding that a due process violation arising from the participation of an interested judge is a defect "not amenable" to harmless-error review, regardless of whether the judge's vote was dispositive. *Puckett* v. *United States*, 556 U. S. 129, 141 (2009) (emphasis deleted). The deliberations of an appellate panel, as a general rule, are confidential. As a result, it is neither possible nor productive to inquire whether the jurist in question might have influenced the views of his or her colleagues during the decisionmaking process. Indeed, one purpose of judicial confidentiality is to assure jurists that they can reexamine old ideas and suggest new ones, while both seeking to persuade and being open to persuasion by their colleagues. As Justice Brennan wrote in his *Lavoie* concurrence,

> "The description of an opinion as being 'for the court' connotes more than merely that the opinion has been

joined by a majority of the participating judges. It re-
flects the fact that these judges have exchanged ideas
and arguments in deciding the case. It reflects the
collective process of deliberation which shapes the
court's perceptions of which issues must be addressed
and, more importantly, how they must be addressed.
And, while the influence of any single participant in
this process can never be measured with precision,
experience teaches us that each member's involve-
ment plays a part in shaping the court's ultimate dis-
position." 475 U. S., at 831.

These considerations illustrate, moreover, that it does
not matter whether the disqualified judge's vote was
necessary to the disposition of the case. The fact that the
interested judge's vote was not dispositive may mean only
that the judge was successful in persuading most members
of the court to accept his or her position. That outcome
does not lessen the unfairness to the affected party. See
*id.*, at 831–832 (Blackmun, J., concurring in judgment).

A multimember court must not have its guarantee of
neutrality undermined, for the appearance of bias de-
means the reputation and integrity not just of one jurist,
but of the larger institution of which he or she is a part.
An insistence on the appearance of neutrality is not some
artificial attempt to mask imperfection in the judicial
process, but rather an essential means of ensuring the
reality of a fair adjudication. Both the appearance and
reality of impartial justice are necessary to the public
legitimacy of judicial pronouncements and thus to the rule
of law itself. When the objective risk of actual bias on the
part of a judge rises to an unconstitutional level, the fail-
ure to recuse cannot be deemed harmless.

The Commonwealth points out that ordering a rehear-
ing before the Pennsylvania Supreme Court may not
provide complete relief to Williams because judges who

were exposed to a disqualified judge may still be influenced by their colleague's views when they rehear the case. Brief for Respondent 51, 62. An inability to guarantee complete relief for a constitutional violation, however, does not justify withholding a remedy altogether. Allowing an appellate panel to reconsider a case without the participation of the interested member will permit judges to probe lines of analysis or engage in discussions they may have felt constrained to avoid in their first deliberations.

Chief Justice Castille's participation in Williams's case was an error that affected the State Supreme Court's whole adjudicatory framework below. Williams must be granted an opportunity to present his claims to a court unburdened by any "possible temptation . . . not to hold the balance nice, clear and true between the State and the accused." *Tumey* v. *Ohio*, 273 U. S. 510, 532 (1927).

\* \* \*

Where a judge has had an earlier significant, personal involvement as a prosecutor in a critical decision in the defendant's case, the risk of actual bias in the judicial proceeding rises to an unconstitutional level. Due process entitles Terrance Williams to "a proceeding in which he may present his case with assurance" that no member of the court is "predisposed to find against him." *Marshall* v. *Jerrico, Inc.*, 446 U. S. 238, 242 (1980).

The judgment of the Supreme Court of Pennsylvania is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 15–5040

## TERRANCE WILLIAMS, PETITIONER *v.* PENNSYLVANIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF PENNSYLVANIA, EASTERN DISTRICT

[June 9, 2016]

CHIEF JUSTICE ROBERTS, with whom JUSTICE ALITO joins, dissenting.

In 1986, Ronald Castille, then District Attorney of Philadelphia, authorized a prosecutor in his office to seek the death penalty against Terrance Williams. Almost 30 years later, as Chief Justice of the Pennsylvania Supreme Court, he participated in deciding whether Williams's fifth habeas petition—which raised a claim unconnected to the prosecution's decision to seek the death penalty—could be heard on the merits or was instead untimely. This Court now holds that because Chief Justice Castille made a "critical" decision as a prosecutor in Williams's case, there is a risk that he "would be so psychologically wedded" to his previous decision that it would violate the Due Process Clause for him to decide the distinct issues raised in the habeas petition. *Ante,* at 6–7 (internal quotation marks omitted). According to the Court, that conclusion follows from the maxim that "no man can be a judge in his own case." *Ante,* at 6 (internal quotation marks omitted).

The majority opinion rests on proverb rather than precedent. This Court has held that there is "a presumption of honesty and integrity in those serving as adjudicators." *Withrow* v. *Larkin*, 421 U. S. 35, 47 (1975). To overcome that presumption, the majority relies on *In re Murchison*, 349 U. S. 133 (1955). We concluded there that the Due

Process Clause is violated when a judge adjudicates the same question—based on the same facts—that he had already considered as a grand juror in the same case. Here, however, Williams does not allege that Chief Justice Castille had *any* previous knowledge of the contested facts at issue in the habeas petition, or that he had previously made *any* decision on the questions raised by that petition. I would accordingly hold that the Due Process Clause did not require Chief Justice Castille's recusal.

## I

In 1986, petitioner Terrance Williams stood trial for the murder of Amos Norwood. Prosecutors believed that Williams and his friend Marc Draper had asked Norwood for a ride, directed him to a cemetery, and then beat him to death with a tire iron after robbing him. Andrea Foulkes, the Philadelphia Assistant District Attorney prosecuting the case, prepared a one-and-a-half page memo for her superiors—Homicide Unit Chief Mark Gottlieb and District Attorney Ronald Castille—"request[ing] that we actively seek the death penalty." App. 424a. The memo briefly described the facts of the case and Williams's prior felonies, including a previous murder conviction. Gottlieb read the memo and then passed it to Castille with a note recommending the death penalty. *Id.,* at 426a. Castille wrote at the bottom of the memo, "Approved to proceed on the death penalty," and signed his name. *Ibid.*

At trial, Williams testified that he had never met Norwood and that someone else must have murdered him. After hearing extensive evidence linking Williams to the crime, the jury convicted him of murder and sentenced him to death. 524 Pa. 218, 227, 570 A. 2d 75, 79–80 (1990).

In 1995, Williams filed a habeas petition in Pennsylvania state court, alleging that his trial counsel had been ineffective for failing to present mitigating evidence of his

childhood sexual abuse, among other claims. At a hearing related to that petition, Williams acknowledged that he knew Norwood and claimed that Norwood had sexually abused him. ___ Pa. ___, ___, 105 A. 3d 1234, 1240 (2014). The petition was denied. Williams filed two more state habeas petitions, which were both dismissed as untimely, and a federal habeas petition, which was also denied. See *Williams* v. *Beard*, 637 F. 3d 195, 238 (CA3 2011).

This case arises out of Williams's fifth habeas petition, which he filed in state court in 2012. In that petition, Williams argued that he was entitled to a new sentencing proceeding because the prosecution at trial had failed to turn over certain evidence suggesting that "Norwood was sexually involved with boys around [Williams's] age at the time of his murder." Crim. No. CP–51–CR–0823621–1984 (Phila. Ct. Common Pleas, Nov. 27, 2012), App. 80a.

It is undisputed that Williams's fifth habeas petition is untimely under Pennsylvania law. In order to overcome that time bar, Pennsylvania law required Williams to show that "(1) the failure to previously raise [his] claim was the result of interference by government officials and (2) the information on which he relies could not have been obtained earlier with the exercise of due diligence." ___ Pa., at ___, 105 A. 3d, at 1240. The state habeas court held that Williams met that burden because "the government withheld multiple statements from [Williams's] trial counsel, all of which strengthened the inference that Amos Norwood was sexually inappropriate with a number of teenage boys," and Williams was unable to access those statements until an evidentiary proceeding ordered by the court. App. 95a.

The Commonwealth appealed to the Pennsylvania Supreme Court, and Williams filed a motion requesting that Chief Justice Castille recuse himself on the ground that he had "personally authorized his Office to seek the death penalty" nearly 30 years earlier. *Id.*, at 181a (em-

phasis deleted).  Chief Justice Castille summarily denied
the recusal motion, and the six-member Pennsylvania
Supreme Court proceeded to hear the case.  The court
unanimously reinstated Williams's sentence.

According to the Pennsylvania Supreme Court, Williams
failed to make the threshold showing necessary to over-
come the time bar because there was "abundant evidence"
that Williams "knew of Norwood's homosexuality and
conduct with teenage boys well before trial, sufficient to
present [Norwood] as unsympathetic before the jury." ___
Pa., at ___, 105 A. 3d, at 1241.  The court pointed out that
Williams was, of course, personally aware of Norwood's
abuse and could have raised the issue at trial, but instead
chose to disclaim having ever met Norwood.  The court
also noted that Williams had raised similar claims of
abuse in his first state habeas proceeding.  *Ibid.*  Chief
Justice Castille concurred separately, criticizing the lower
court for failing to dismiss Williams's petition as "time-
barred and frivolous."  *Id.,* at ___, 105 A. 3d, at 1245.

## II
### A

In the context of a criminal proceeding, the Due Process
Clause requires States to adopt those practices that are
fundamental to principles of liberty and justice, and which
inhere "in the very idea of free government" and are "the
inalienable right of a citizen of such a government."  *Twin-
ing* v. *New Jersey*, 211 U. S. 78, 106 (1908).  A fair trial
and appeal is one such right.  See *Lisenba* v. *California*,
314 U. S. 219, 236 (1941); *Aetna Life Ins. Co.* v. *Lavoie*,
475 U. S. 813, 825 (1986).  In ensuring that right, "it is
normally within the power of the State to regulate proce-
dures under which its laws are carried out," unless a
procedure "offends some principle of justice so rooted in
the traditions and conscience of our people as to be ranked
as fundamental."  *Id.*, at 821 (internal quotation marks

omitted).

It is clear that a judge with "a direct, personal, substantial, pecuniary interest" in a case may not preside over that case. *Tumey* v. *Ohio*, 273 U. S. 510, 523 (1927). We have also held that a judge may not oversee a criminal contempt proceeding where the judge has previously served as grand juror in the same case, or where the party charged with contempt has conducted "an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification." *Mayberry* v. *Pennsylvania*, 400 U. S. 455, 465–466 (1971) (internal quotation marks omitted); see *Murchison*, 349 U. S., at 139.

Prior to this Court's decision in *Caperton* v. *A. T. Massey Coal Co.*, 556 U. S. 868 (2009), we had declined to require judicial recusal under the Due Process Clause beyond those defined situations. In *Caperton*, however, the Court adopted a new standard that requires recusal "when the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id.,* at 872 (internal quotation marks omitted). The Court framed the inquiry as "whether, under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.,* at 883–884 (internal quotation marks omitted).

## B

According to the majority, the Due Process Clause required Chief Justice Castille's recusal because he had "significant, personal involvement in a critical trial decision" in Williams's case. *Ante,* at 9. Otherwise, the majority explains, there is "an unacceptable risk of actual bias." *Ante*, at 11. In the majority's view, "[t]his conclusion follows from the Court's analysis in *In re Murchison*." *Ante,* at 6. But *Murchison* does not support the majority's

new rule—far from it.

*Murchison* involved a peculiar Michigan law that authorized the same person to sit as both judge and "one-man grand jury" in the same case. 349 U. S., at 133 (internal quotation marks omitted). Pursuant to that law, a Michigan judge—serving as grand jury—heard testimony from two witnesses in a corruption case. The testimony "persuaded" the judge that one of the witnesses "had committed perjury"; the second witness refused to answer questions. *Id.,* at 134–135. The judge accordingly charged the witnesses with criminal contempt, presided over the trial, and convicted them. *Ibid.* We reversed, holding that the trial had violated the Due Process Clause. *Id.,* at 139.

The Court today, acknowledging that *Murchison* "differ[s] in many respects from a case like this one," *ante,* at 7, earns full marks for understatement. The Court in fact fails to recognize the differences that are critical.

First, *Murchison* found a due process violation because the judge (sitting as grand jury) accused the witnesses of contempt, and then (sitting as judge) presided over their trial on that charge. As a result, the judge had made up his mind about the only issue in the case before the trial had even begun. We held that such prejudgment violated the Due Process Clause. 349 U. S., at 137.

Second, *Murchison* expressed concern that the judge's recollection of the testimony he had heard as grand juror was "likely to weigh far more heavily with him than any testimony given" at trial. *Id.,* at 138. For that reason, the Court found that the judge was at risk of calling "on his own personal knowledge and impression of what had occurred in the grand jury room," rather than the evidence presented to him by the parties. *Ibid.*

Neither of those due process concerns is present here. Chief Justice Castille was involved in the decision to seek the death penalty, and perhaps it would be reasonable under *Murchison* to require him to recuse himself from

any challenge casting doubt on that recommendation. But that is not this case.

This case is about whether Williams may overcome the procedural bar on filing an untimely habeas petition, which required him to show that the government inter-fered with his ability to raise his habeas claim, and that "the information on which he relies could not have been obtained earlier with the exercise of due diligence." \_\_\_ Pa., at \_\_\_, 105 A. 3d, at 1240. Even if Williams were to overcome the timeliness bar, moreover, the only claim he sought to raise on the merits was that the prosecution had failed to turn over certain evidence at trial. The problem in *Murchison* was that the judge, having been "part of the accusatory process" regarding the guilt or innocence of the defendants, could not then be "wholly disinterested" when called upon to decide that very same issue. 349 U. S., at 137. In this case, in contrast, neither the procedural question nor Williams's merits claim in any way concerns the pretrial decision to seek the death penalty.

It is abundantly clear that, unlike in *Murchison*, Chief Justice Castille had *not* made up his mind about either the contested evidence or the legal issues under review in Williams's fifth habeas petition. How could he have? Neither the contested evidence nor the legal issues were ever before him as prosecutor. The one-and-a-half page memo prepared by Assistant District Attorney Foulkes in 1986 did not discuss the evidence that Williams claims was withheld by the prosecution at trial. It also did not discuss Williams's allegation that Norwood sexually abused young men. It certainly did not discuss whether Williams could have obtained that evidence of abuse ear-lier through the exercise of due diligence.

Williams does not assert that Chief Justice Castille had any prior knowledge of the alleged failure of the prosecu-tion to turn over such evidence, and he does not argue that Chief Justice Castille had previously made any decision

with respect to that evidence in his role as prosecutor. Even assuming that Chief Justice Castille remembered the contents of the memo almost 30 years later—which is doubtful—the memo could not have given Chief Justice Castille any special "impression" of facts or issues not raised in that memo. *Id.*, at 138.

The majority attempts to justify its rule based on the "risk" that a judge "would be so psychologically wedded to his or her previous position as a prosecutor that the judge would consciously or unconsciously avoid the appearance of having erred or changed position." *Ante,* at 7 (internal quotation marks omitted). But as a matter of simple logic, nothing about how Chief Justice Castille might rule on Williams's fifth habeas petition would suggest that the judge had erred or changed his position on the distinct question whether to seek the death penalty prior to trial. In sum, there was not such an "objective risk of actual bias," *ante,* at 13, that it was fundamentally unfair for Chief Justice Castille to participate in the decision of an issue having nothing to do with his prior participation in the case.

*      *      *

The Due Process Clause did not prohibit Chief Justice Castille from hearing Williams's case. That does not mean, however, that it was appropriate for him to do so. Williams cites a number of state court decisions and ethics opinions that prohibit a prosecutor from later serving as judge in a case that he has prosecuted. Because the Due Process Clause does not mandate recusal in cases such as this, it is up to state authorities—not this Court—to determine whether recusal should be required.

I would affirm the judgment of the Pennsylvania Supreme Court, and respectfully dissent from the Court's contrary conclusion.

# SUPREME COURT OF THE UNITED STATES

No. 15–5040

TERRANCE WILLIAMS, PETITIONER *v.*
PENNSYLVANIA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
PENNSYLVANIA, EASTERN DISTRICT

[June 9, 2016]

JUSTICE THOMAS, dissenting.

The Court concludes that it violates the Due Process Clause for the chief justice of the Supreme Court of Pennsylvania, a former district attorney who was not the trial prosecutor in petitioner Terrance Williams' case, to review Williams' fourth petition for state postconviction review. *Ante,* at 8–9, 14. That conclusion is flawed. The specter of bias alone in a judicial proceeding is not a deprivation of due process. Rather than constitutionalize every judicial disqualification rule, the Court has left such rules to legislatures, bar associations, and the judgment of individual adjudicators. Williams, moreover, is not a criminal defendant. His complaint is instead that the due process protections in his state postconviction proceedings—an altogether new civil matter, not a continuation of his criminal trial—were lacking. Ruling in Williams' favor, the Court ignores this posture and our precedents commanding less of state postconviction proceedings than of criminal prosecutions involving defendants whose convictions are not yet final. I respectfully dissent.

I

A reader of the majority opinion might mistakenly think that the prosecution against Williams is ongoing, for the majority makes no mention of the fact that Williams'

sentence has been final for more than 25 years. Because the postconviction posture of this case is of crucial importance in considering the question presented, I begin with the protracted procedural history of Williams' repeated attempts to collaterally attack his sentence.

### A

Thirty-two years ago, Williams and his accomplice beat their victim to death with a tire iron and a socket wrench. *Commonwealth* v. *Williams*, 524 Pa. 218, 222–224, 570 A. 2d 75, 77–78 (1990) (*Williams I*). Williams later returned to the scene of the crime, a cemetery, soaked the victim's body in gasoline, and set it on fire. *Id.,* at 224, 570 A. 2d, at 78. After the trial against Williams commenced, both the Chief of the Homicide Unit and the District Attorney, Ronald Castille, approved the trial prosecutor's decision to seek the death penalty by signing a piece of paper. See App. 426. That was Castille's only involvement in Williams' criminal case. Thereafter, a Pennsylvania jury convicted Williams of first-degree murder, and he was sentenced to death. *Williams I*, 524 Pa., at 221–222, 570 A. 2d, at 77. The Supreme Court of Pennsylvania affirmed his conviction and sentence. *Id.,* at 235, 570 A. 2d, at 84.

Five years later, Williams filed his first petition for state postconviction relief. *Commonwealth* v. *Williams*, 581 Pa. 57, 65, 863 A. 2d 505, 509 (2004) (*Williams II*). The postconviction court denied the petition. *Id.,* at 65, 863 A. 2d, at 510. Williams appealed, raising 23 alleged errors. *Ibid.* The Supreme Court of Pennsylvania, which included Castille in his new capacity as a justice of that court, affirmed the denial of relief. *Id.,* at 88, 863 A. 2d, at 523. The court rejected some claims on procedural grounds and denied the remaining claims on the merits. *Id.,* at 68–88, 863 A. 2d, at 511–523. The court's lengthy opinion did not mention the possibility of Castille's bias, and Williams

apparently never asked for his recusal.

Then in 2005, Williams filed two more petitions for state postconviction relief. Both petitions were dismissed as untimely, and the Supreme Court of Pennsylvania affirmed. *Commonwealth* v. *Williams*, 589 Pa. 355, 909 A. 2d 297 (2006) (*per curiam*) (*Williams III*); *Commonwealth* v. *Williams*, 599 Pa. 495, 962 A. 2d 609 (2009) (*per curiam*) (*Williams IV*). Castille also presumably participated in those proceedings, but, again, Williams apparently did not ask for him to recuse.[1]

Williams then made a fourth attempt to vacate his sentence in state court in 2012. ___ Pa. ___, ___, 105 A. 3d 1234, 1237 (2014) (*Williams VI*). Williams alleged that the prosecution violated *Brady* v. *Maryland*, 373 U. S. 83 (1963), by failing to disclose exculpatory evidence. The allegedly exculpatory evidence was information about Williams' motive. According to Williams, the prosecution should have disclosed to his counsel that it knew that Williams and the victim had previously engaged in a sexual relationship when Williams was a minor. *Williams VI*, ___ Pa., at ___, 105 A. 3d, at 1237.[2] The state postcon-

_____

[1] In 2005, Williams also filed a federal habeas petition, which the federal courts ultimately rejected. *Williams* v. *Beard*, 637 F. 3d 195, 238 (CA3 2011) (*Williams V*), cert. denied, *Williams* v. *Wetzel*, 567 U. S. ___ (2012).

[2] Setting aside how a prosecutor could violate *Brady* by failing to disclose information to the defendant about the defendant's motive to kill, it is worth noting that this allegation merely repackaged old arguments. During a state postconviction hearing in 1998, Williams had presented evidence of his prior sexual abuse, including "multiple sexual victimizations (including sodomy) during his childhood," to support his ineffective assistance claim. *Williams II*, 581 Pa. 57, 98, 863 A. 2d 505, 530 (2004) (Saylor, J., dissenting). And he had "argued [that the victim] engaged in homosexual acts with him." *Williams VI*, __ Pa., at ___, 105 A. 3d, at 1236. Then, in his federal habeas proceedings, Williams admitted that his plan on the night of the murder was to threaten to reveal to the victim's wife that the victim was a homosexual, and he contended that his attorney should have presented related

viction court agreed and vacated his sentence. *Id.*, at ___, 105 A. 3d, at 1239.

The Commonwealth appealed to the Supreme Court of Pennsylvania. Only then—the *fourth* time that Williams appeared before Castille—did Williams ask him to recuse. App. 181. Castille denied the recusal motion and declined to refer it to the full court. *Id.*, at 171. Shortly thereafter, the court vacated the postconviction court's order and reinstated Williams' sentence. The court first noted that Williams' fourth petition "was filed over 20 years after [Williams'] judgment of sentence became final" and "was untimely on its face." *Williams VI*, ___ Pa., at ___, 105 A. 3d, at 1239. The court rejected the trial court's conclusion that an exception to Pennsylvania's timeliness rule applied and reached "the inescapable conclusion that [Williams] is not entitled to relief." *Id.,* at ___, 105 A. 3d, at 1239–1241; see also *id.,* at ___, 105 A. 3d, at 1245 (Castille, J., concurring) (writing separately "to address the important responsibilities of the [state postconviction] trial courts in serial capital [state postconviction] matters").

Finally, Williams filed an application for reargument. App. 9. The court denied the application *without* Castille's participation. *Id.,* at 8. Castille had retired from the bench nearly two months before the court ruled.

### B

As this procedural history illustrates, the question presented is hardly what the majority makes it out to be. The majority incorrectly refers to the case before us and Williams' criminal case (that ended in 1990) as a decades-long "single case" or "matter." *Ante,* at 8; see also *ante,* at 7–9. The majority frames the issue as follows: whether

_____

evidence of the victim's prior sexual relationship with him. *Williams V*, *supra*, at 200, 225–226, 229–230.

the Due Process Clause permits Castille to "ac[t] as both accuser and judge in [Williams'] case." *Ante,* at 5. The majority answers: "When a judge has served as an advocate for the State *in the very case* the court is now asked to adjudicate, a serious question arises as to whether the judge, even with the most diligent effort, could set aside any personal interest in the outcome." *Ante,* at 7 (emphasis added). Accordingly, the majority holds that "[w]here a judge has had an earlier significant, personal involvement as a prosecutor in a critical decision *in the defendant's case*, the risk of actual bias in the judicial proceeding rises to an unconstitutional level." *Ante,* at 14 (emphasis added). That is all wrong.

There has been, however, no "single case" in which Castille acted as both prosecutor and adjudicator. Castille was still serving in the district attorney's office when Williams' criminal proceedings ended and his sentence of death became final. Williams' filing of a petition for state postconviction relief did not continue (or resurrect) that already final criminal proceeding. A postconviction proceeding "is not part of the criminal proceeding itself" but "is in fact considered to be civil in nature," *Pennsylvania* v. *Finley*, 481 U. S. 551, 556–557 (1987), and brings with it fewer procedural protections. See, *e.g., District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. 52, 68 (2009).

Williams' case therefore presents a much different question from that posited by the majority. It is more accurately characterized as whether a judge may review a petition for postconviction relief when that judge previously served as district attorney while the petitioner's criminal case was pending. For the reasons that follow, that different question merits a different answer.

## II

The "settled usages and modes of proceeding existing in

the common and statute law of England before the emigration of our ancestors" are the touchstone of due process. *Tumey* v. *Ohio*, 273 U. S. 510, 523 (1927); see also *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 277 (1856). What due process requires of the judicial proceedings in the Pennsylvania postconviction courts, therefore, is guided by the historical treatment of judicial disqualification. And here, neither historical practice nor this Court's case law constitutionalizing that practice requires a former prosecutor to recuse from a prisoner's postconviction proceedings.

A

At common law, a fair tribunal meant that "no man shall be a judge in his own case." 1 E. Coke, Institutes of the Laws of England §212, \*141a ("[A]*liquis non debet esse judex in propiâ causâ*"). That common-law conception of a fair tribunal was a narrow one. A judge could not decide a case in which he had a direct and personal financial stake. For example, a judge could not reap the fine paid by a defendant. See, *e.g., Dr. Bonham's Case*, 8 Co. Rep. 107a, 114a, 118a, 77 Eng. Rep. 638, 647, 652 (C. P. 1610) (opining that a panel of adjudicators could not all at once serve as "judges to give sentence or judgment; ministers to make summons; and parties to have the moiety of the forfeiture"). Nor could he adjudicate a case in which he was a party. See, *e.g., Earl of Derby's Case,* 12 Co. Rep. 114, 77 Eng. Rep. 1390 (K. B. 1614). But mere bias—without any financial stake in a case—was not grounds for disqualification. The biases of judges "cannot be challenged," according to Blackstone, "[f]or the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." 3 W. Blackstone, Commentaries on the Laws of England, 361 (1768) (Blackstone); see also, *e.g., Brookes* v. *Earl of Riv-*

*ers,* Hardres 503, 145 Eng. Rep. 569 (Exch. 1668) (deciding that a judge's "favour shall not be presumed" merely because his brother-in-law was involved).

The early American conception of judicial disqualification was in keeping with the "clear and simple" common-law rule—"a judge was disqualified for direct pecuniary interest and for nothing else." Frank, Disqualification of Judges, 56 Yale L. J. 605, 609 (1947) (Frank); see also R. Flamm, Judicial Disqualification: Recusal and Disqualification of Judges §1.4, p. 7 (2d ed. 2007). Most jurisdictions required judges to recuse when they stood to profit from their involvement or, more broadly, when their property was involved. See *Moses* v. *Julian*, 45 N. H. 52, 55–56 (1863); see also, *e.g.*, *Jim* v. *State*, 3 Mo. 147, 155 (1832) (deciding that a judge was unlawfully interested in a criminal case in which his slave was the defendant). But the judge's pecuniary interest had to be directly implicated in the case. See, *e.g., Davis* v. *State*, 44 Tex. 523, 524 (1876) (deciding that a judge, who was the victim of a theft, was not disqualified in the prosecution of the theft); see also T. Cooley, Constitutional Limitations 594 (7th ed. 1903) (rejecting a financial stake "so remote, trifling, and insignificant that it may fairly be supposed to be incapable of affecting the judgment"); *Moses, supra,* at 57 ("[A] creditor, lessee, or debtor, may be judge in the case of his debtor, landlord, or creditor, except in cases where the amount of the party's property involved in the suit is so great that his ability to meet his engagements with the judge may depend upon the success of his suit"); *Inhabitants of Readington Twp. Hunterdon County* v. *Dilley*, 24 N. J. L. 209, 212–213 (N. J. 1853) (deciding that a judge, who had previously been paid to survey the roadway at issue in the case, was not disqualified).

Shortly after the founding, American notions of judicial disqualification expanded in important respects. Of particular relevance here, the National and State Legisla-

tures enacted statutes and constitutional provisions that
diverged from the common law by requiring disqualifica-
tion when the judge had served as counsel for one of the
parties. The first federal recusal statute, for example,
required disqualification not only when the judge was
"concerned in interest," but also when he "ha[d] been of
counsel for either party." Act of May 8, 1792, §11, 1 Stat.
278–279. Many States followed suit by enacting similar
disqualification statutes or constitutional provisions ex-
panding the common-law rule. See, *e.g., Wilks* v. *State*, 27
Tex. App. 381, 385, 11 S. W. 415, 416 (1889); *Fechheimer*
v. *Washington*, 77 Ind. 366, 368 (1881) (*per curiam*);
*Sjoberg* v. *Nordin*, 26 Minn. 501, 503, 5 N. W. 677, 678
(1880); *Whipple* v. *Saginaw Circuit Court Judge*, 26 Mich.
342, 343 (1873); *Mathis* v. *State*, 50 Tenn. 127, 128 (1871);
but see *Owings* v. *Gibson*, 9 Ky. 515, 517–518 (1820) (de-
ciding that it was for the judge to choose whether he could
fairly adjudicate a case in which he had served as a lawyer
for the plaintiff in the same action). Courts applied this
expanded view of disqualification not only in cases involv-
ing judges who had previously served as counsel for pri-
vate parties but also for those who previously served as
former attorneys general or district attorneys. See, *e.g.*,
*Terry* v. *State*, 24 S. W. 510, 510–511 (Tex. Crim. App.
1893); *Mathis, supra,* at 128.

   This expansion was modest: disqualification was re-
quired only when the newly appointed judge had served as
counsel in the *same case*. In *Carr* v. *Fife*, 156 U. S. 494
(1895), for example, this Court rejected the argument that
a judge was required to recuse because he had previously
served as counsel for some of the defendants in another
matter. *Id.*, at 497–498. The Court left it to the judge "to
decide for himself whether it was improper for him to sit
in trial of the suit." *Id.*, at 498. Likewise, in *Taylor* v.
*Williams*, 26 Tex. 583 (1863), the Supreme Court of Texas
acknowledged that a judge was not, "by the common law,

disqualified from sitting in a cause in which he had been of counsel" and concluded "that the fact that the presiding judge had been of counsel in the case did not necessarily render him interested in it." *Id.*, at 585–586. *A fortiori*, the Texas court held, a judge was not "interested" in a case "merely from his having been of counsel in *another cause* involving the same title." *Id.*, at 586 (emphasis added); see also *The Richmond*, 9 F. 863, 864 (CCED La. 1881) ("The decisions, so far as I have been able to find, are unanimous that 'of counsel' means 'of counsel for a party in that cause and in that controversy,' and if either the cause or controversy is not identical the disqualification does not exist"); *Wolfe* v. *Hines*, 93 Ga. 329, 20 S. E. 322 (1894) (same); *Cleghorn* v. *Cleghorn*, 66 Cal. 309, 5 P. 516 (1885) (same).

This limitation—that the same person must act as counsel and adjudicator in *the same case*—makes good sense. At least one of the State's highest courts feared that any broader rule would wreak havoc: "If the circumstance of the judge having been of counsel, for some parties in some case involving some of the issues which had been theretofore tried[,] disqualified him from acting in every case in which any of those parties, or those issues should be subsequently involved, the most eminent members of the bar, would, by reason of their extensive professional relations and their large experience be rendered ineligible, or useless as judges." *Blackburn* v. *Craufurd*, 22 Md. 447, 459 (1864). Indeed, any broader rule would be at odds with this Court's historical practice. Past Justices have decided cases involving their former clients in the private sector or their former offices in the public sector. See Frank 622–625. The examples are legion; chief among them is *Marbury* v. *Madison*, 1 Cranch 137 (1803), in which then–Secretary of State John Marshall sealed but failed to deliver William Marbury's commission and then, as newly appointed Chief Justice, Marshall decided

whether mandamus was an available remedy to require James Madison to finish the job. See Paulsen, Marbury's Wrongness, 20 Constitutional Commentary 343, 350 (2003).

Over the next century, this Court entered the fray of judicial disqualifications only a handful of times. Drawing from longstanding historical practice, the Court announced that the Due Process Clause compels judges to disqualify in the narrow circumstances described below. But time and again, the Court cautioned that "[a]ll questions of judicial qualification may not involve constitutional validity." *Tumey*, 273 U. S., at 523. And "matters of kinship, personal bias, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion." *Ibid.*; see also *Aetna Life Ins. Co.* v. *Lavoie*, 475 U. S. 813, 828 (1986) ("The Due Process Clause demarks only the outer boundaries of judicial disqualifications").

First, in *Tumey*, the Court held that due process would not tolerate an adjudicator who would profit from the case if he convicted the defendant. The Court's holding paralleled the common-law rule: "[I]t certainly violates the Fourteenth Amendment, and deprives a defendant in a criminal case of due process of law, to subject his liberty or property to the judgment of a court, the judge of which has a *direct, personal, substantial pecuniary interest* in reaching a conclusion against him in his case." 273 U. S., at 523 (emphasis added); see also *Ward* v. *Monroeville*, 409 U. S. 57, 59, 61 (1972) (deciding that a mayor could not adjudicate traffic violations if revenue from convictions constituted a substantial portion of the municipality's revenue). Later, applying *Tumey*'s rule in *Aetna Life Ins.*, the Court held that a judge who decided a case involving an insurance company had a "direct, personal, substantial, and pecuniary" interest because he had brought a similar case against an insurer and his opinion for the court "had the

clear and immediate effect of enhancing both the legal status and the settlement value of his own case." 475 U. S., at 824 (alterations and internal quotation marks omitted).

Second, in *In re Murchison*, 349 U. S. 133 (1955), the Court adopted a constitutional rule resembling the historical practice for disqualification of former counsel. *Id.,* at 139. There, state law empowered a trial judge to sit as a "'one man judge-grand jury,'" meaning that he could "compel witnesses to appear before him in secret to testify about suspected crimes." *Id.*, at 133. During those secret proceedings, the trial judge suspected that one of the witnesses, Lee Roy Murchison, had committed perjury, and he charged another, John White, with contempt after he refused to answer the judge's questions without counsel present. See *id.,* at 134–135. The judge then tried both men in open court and convicted and sentenced them based, in part, on his interrogation of them in the secret proceedings. See *id.,* at 135, 138–139. The defendants appealed, arguing that the "trial before the judge who was at the same time the complainant, indicter and prosecutor, constituted a denial of fair and impartial trial required by" due process. *Id.,* at 135. This Court agreed: "It would be very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a result of his investigations." *Id.,* at 137. Broadly speaking, *Murchison*'s rule constitutionalizes the early American statutes requiring disqualification when a single person acts as both counsel and judge in a single civil or criminal proceeding.[3]

--------

[3] The Court has applied *Murchison* in later cases involving contempt proceedings in which a litigant's contemptuous conduct is so egregious that the judge "become[s] so 'personally embroiled'" in the controversy that it is as if the judge is a party himself. *Mayberry* v. *Pennsylvania*, 400 U. S. 455, 465 (1971); see also *Taylor* v. *Hayes*, 418 U. S. 488, 501–503 (1974).

Both *Tumey* and *Murchison* arguably reflect historical understandings of judicial disqualification. Traditionally, judges disqualified themselves when they had a direct and substantial pecuniary interest or when they served as counsel in the same case.

## B

Those same historical understandings of judicial disqualification resolve Williams' case. Castille did not serve as both prosecutor and judge in the case before us. Even assuming Castille's supervisory role as district attorney was tantamount to serving as "counsel" in Williams' criminal case, that case ended nearly five years before Castille joined the Supreme Court of Pennsylvania. Castille then participated in a separate proceeding by reviewing Williams' petition for postconviction relief.

As discussed above, see Part I–B, *supra*, this postconviction proceeding is not an extension of Williams' criminal case but is instead a new civil proceeding. See *Finley*, 481 U. S., at 556–557. Our case law bears out the many distinctions between the two proceedings. In his criminal case, Williams was presumed innocent, *Coffin* v. *United States*, 156 U. S. 432, 453 (1895), and the Constitution guaranteed him counsel, *Gideon* v. *Wainwright*, 372 U. S. 335, 344–345 (1963); *Powell* v. *Alabama*, 287 U. S. 45, 68–69 (1932), a public trial by a jury of his peers, *Duncan* v. *Louisiana*, 391 U. S. 145, 149 (1968), and empowered him to confront the witnesses against him, *Crawford* v. *Washington*, 541 U. S. 36, 68 (2004), as well as all the other requirements of a criminal proceeding. But in postconviction proceedings, "the presumption of innocence [has] disappear[ed]." *Herrera* v. *Collins*, 506 U. S. 390, 399 (1993). The postconviction petitioner has no constitutional right to counsel. *Finley, supra,* at 555–557; see also *Johnson* v. *Avery*, 393 U. S. 483, 488 (1969). Nor has this Court ever held that he has a right to demand that his postcon-

viction court consider a freestanding claim of actual inno-
cence, *Herrera, supra,* at 417–419, or to demand the State
to turn over exculpatory evidence, *Osborne,* 557 U. S., at
68–70; see also *Wright* v. *West,* 505 U. S. 277, 293 (1992)
(plurality opinion) (cataloguing differences between direct
and collateral review and concluding that "[t]hese differ-
ences simply reflect the fact that habeas review entails
significant costs" (internal quotation marks omitted)).
And, under the Court's precedents, his due process rights
are "not parallel to a trial right, but rather must be ana-
lyzed in light of the fact that he has already been found
guilty at a fair trial, and has only a limited interest in
postconviction relief." *Osborne, supra,* at 69.

Because Castille did not act as both counsel and judge in
the same case, Castille's participation in the postconvic-
tion proceedings did not violate the Due Process Clause.
Castille might have been "personal[ly] involve[d] in a
critical trial decision," *ante,* at 9, but that "trial" was
Williams' criminal trial, not the postconviction proceed-
ings before us now. Perhaps Castille's participation in
Williams' postconviction proceeding was unwise, but it
was within the bounds of historical practice. That should
end this case, for it "is not for Members of this Court to
decide from time to time whether a process approved by
the legal traditions of our people is 'due' process." *Pacific
Mut. Life Ins. Co.* v. *Haslip,* 499 U. S. 1, 28 (1991) (Scalia,
J., concurring in judgment).

## C

Today's holding departs both from common-law practice
and this Court's prior precedents by ignoring the critical
distinction between criminal and postconviction proceed-
ings. Chief Justice Castille had no "direct, personal, sub-
stantial pecuniary interest" in the adjudication of Wil-
liams' fourth postconviction petition. *Tumey,* 273 U. S., at
523. And although the majority invokes *Murchison, ante,*

at 6–8, it wrongly relies on that decision too. In *Murchison*, the judge acted as both the accuser and judge in the *same* proceeding. 349 U. S., at 137–139. But here, Castille did not. See Part II–B, *supra*.

The perceived bias that the majority fears is instead outside the bounds of the historical expectations of judicial recusal. Perceived bias (without more) was not recognized as a constitutionally compelled ground for disqualification until the Court's recent decision in *Caperton* v. *A. T. Massey Coal Co.*, 556 U. S. 868 (2009). In *Caperton*, the Court decided that due process demanded disqualification when "extreme facts" proved "the probability of actual bias." *Id.,* at 886–887. *Caperton*, of course, elicited more questions than answers. *Id.,* at 893–898 (ROBERTS, C. J., dissenting). And its conclusion that bias alone could be grounds for disqualification as a constitutional matter "represents a complete departure from common law principles." Frank 618–619; see Blackstone 361 ("[T]he law will not suppose a possibility of bias or favor in a judge").

The Court, therefore, should not so readily extend *Caperton*'s "probability of actual bias" rule to state postconviction proceedings. This Court's precedents demand far less "process" in postconviction proceedings than in a criminal prosecution. See *Osborne*, *supra*, at 69; see also *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 895 (1961) (concluding that the Due Process Clause does not demand "inflexible procedures universally applicable to every imaginable situation"). If a state habeas petitioner is not entitled to counsel as a constitutional matter in state postconviction proceedings, *Finley*, *supra*, at 555–557, it is not unreasonable to think that he is likewise not entitled to demand, as a constitutional matter, that a state postconviction court consider his case anew because a judge, who had no direct and substantial pecuniary interest and had not served as counsel in this case, failed to recuse himself.

The bias that the majority fears is a problem for the state legislature to resolve, not the Federal Constitution. See, *e.g., Aetna Life Ins.,* 475 U. S., at 821 ("We need not decide whether allegations of bias or prejudice by a judge of the type we have here would ever be sufficient under the Due Process Clause to force recusal"). And, indeed, it appears that Pennsylvania has set its own standard by requiring a judge to disqualify if he "served in governmental employment, and in such capacity participated personally and substantially as a lawyer or public official concerning the proceeding" in its Code of Judicial Conduct. See Pa. Code of Judicial Conduct Rule 2.11(A)(6)(b) (West 2016). Officials in Pennsylvania are fully capable of deciding when their judges have "participated personally and substantially" in a manner that would require disqualification without this Court's intervention. Due process requires no more, especially in state postconviction review where the States "ha[ve] more flexibility in deciding what procedures are needed." *Osborne, supra,* at 69.

## III

Even if I were to assume that an error occurred in Williams' state postconviction proceedings, the question remains whether there is anything left for the Pennsylvania courts to remedy. There is not.

The majority remands the case to "[a]llo[w] an appellate panel to reconsider a case without the participation of the interested member," which it declares "will permit judges to probe lines of analysis or engage in discussions they may have felt constrained to avoid in their first deliberations." *Ante,* at 14. The majority neglects to mention that the Supreme Court of Pennsylvania might have done just that. It entertained Williams' motion for reargument without Castille, who had retired months before the court denied the motion. The Supreme Court of Pennsylvania is free to decide on remand that it cured any alleged depriva-

tion of due process in Williams' postconviction proceeding by considering his motion for reargument without Castille's participation.

* * *

This is not a case about the "'accused.'" *Ante*, at 14 (quoting *Tumey*, *supra*, at 532). It is a case about the due process rights of the already convicted. Whatever those rights might be, they do not include policing alleged violations of state codes of judicial ethics in postconviction proceedings. The Due Process Clause does not require any and all conceivable procedural protections that Members of this Court think "Western liberal democratic government ought to guarantee to its citizens." Monaghan, Our Perfect Constitution, 56 N. Y. U. L. Rev. 353, 358 (1981) (emphasis deleted). I respectfully dissent.