570 A.2d 75

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Terrance WILLIAMS, Appellant.**

Supreme Court of Pennsylvania,
Eastern District.

Argued Oct. 23, 1989.

Decided Feb. 8, 1990.

Norris Gelman, Philadelphia, for appellant.

Gaele McLaughlin Barthold, Deputy Dist. Atty., Ronald Eisenberg, Chief, Appeals Div., Hugh J. Burns, Jr., Asst. Dist. Atty., Robert A. Graci, Chief, Deputy Atty. Gen., Brian P. Gottlieb, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

The appellant, after a trial by jury, was found guilty of first degree murder,[1] criminal conspiracy,[2] and robbery.[3] In the penalty stage of the trial, the same jury found two

1. 18 Pa.C.S. §§ 2501; 2502(a).
2. 18 Pa.C.S. § 903.
3. 18 Pa.C.S. § 3921.

aggravating circumstances and no mitigating circumstances. Accordingly, appellant was sentenced to death on the first degree murder charge.[4] Subsequent to trial, appellant retained private counsel and his appointed trial counsel was permitted to withdraw. His new counsel filed lengthy and detailed post-trial motions, including a motion to vacate the death penalty. Also, appellant was permitted to file additional *pro se* motions containing multiple averments of trial error, prosecutorial misconduct and ineffectiveness of trial counsel. After a hearing, all post-trial motions were denied and formal sentence was imposed. In addition to the death penalty on the first degree murder charge, appellant was sentenced to a term of five (5) to ten (10) years on the conspiracy charge and ten (10) to twenty (20) years on the robbery charge, with the additional sentences to run consecutive to each other but concurrent to the death penalty sentence. The judgments of sentence were appealed directly to this Court.[5]

The facts underlying appellant's convictions are as follows.[6] In the late afternoon on Monday, June 11, 1984, appellant and Marc Draper, both eighteen years old at the time, were gambling with a few other unidentified persons on the corner of Mount Pleasant Avenue and Lincoln Drive in Philadelphia. The two, who had been close friends since third grade, both lost all their money while gambling. After conferring as to potential sources of additional funds, appellant advised Draper that he knew a man, Amos Norwood, who lived nearby from whom they could extort money. Unfortunately for Mr. Norwood, age 56, extortion was merely the opening scene in his personal tragedy.

After discussing the proposed extortion, appellant and Draper then proceeded to the Norwood residence. While Draper waited at a nearby corner, appellant spent fifteen

4. 42 Pa.C.S. § 9711.

5. 42 Pa.C.S. § 722(4) and 42 Pa.C.S. § 9711(h).

6. The activities of appellant prior to and at the time of the murder are based primarily on the testimony of appellant's co-murderer, Marc Draper.

minutes in Norwood's house before rejoining Draper with ten dollars he had secured from Norwood. As he was exiting Norwood's residence, appellant crossed paths with Norwood's wife, Mamie. Although they did not know each other, appellant said hello to Mrs. Norwood as she passed by. Draper witnessed this exchange, although he did not know Mr. or Mrs. Norwood.

After securing the ten dollars from Norwood, appellant and Draper returned to the scene of the gambling but the participants had taken a break and were merely "rapping" i.e. talking. The pair remained, talking with the others. As misfortune would have it, Mr. Norwood, two or three hours later while on his way to his church to do some volunteer work, was driving by the intersection where the "rapping" was occurring. Appellant, upon seeing Norwood, flagged his car down, got in the car and drove away. A few minutes later, he returned with Norwood to the intersection, got out of the car and said to Draper "play it off like you going home, like you want to ride home, and we gonna take some money." Draper, grasping appellant's plan, got in the car with appellant and Norwood, and proceeded to give Norwood false directions home, leading Norwood instead to a dark secluded area adjacent to a cemetery.

At that point, Draper, who was in the rear driver's side seat, grabbed Norwood from behind and appellant, in the front passenger seat, ordered Norwood to "be quiet and get out of the car." Appellant, Draper and Norwood exited the car, climbed over a small fence and proceeded into the cemetery. Upon arriving at some tombstones, Norwood was ordered to lie face down. Appellant and Draper searched Norwood and found twenty dollars hidden in his sock. While Norwood was begging for his life, the assailants tied his hands behind his back with his shirt, tied his legs together with his pants and stuffed his socks in his mouth.

Appellant then told Draper, "Wait, I'm going to the car ... We're getting ready to do something." He then went to the car and returned with a socket wrench, which he

gave to Draper, and a tire iron. After some discussion between appellant and Draper,[7] appellant commenced repeatedly hitting Norwood about the head with the tire iron. Appellant, while hitting the victim, said to Draper, "Man, you with me. We got to do this together." Whereupon, Draper joined in the brutality, striking Norwood's head repeatedly with the socket wrench, while appellant was smashing him with the tire iron.

Finally, when they perceived the victim was dead, the beating stopped and the body was hidden behind two tombstones and covered with some loose brush. The pair then returned to the victim's car, emptied the contents of the glove compartment into a trash bag and dumped the bag into a nearby trash bin. They then drove to Draper's house, where he got ready for work.[8] After making arrangements to meet the next morning, Draper went to work and appellant drove the victim's car to downtown Philadelphia to meet Ronald Rucker, a friend of some two months.

Rucker testified at trial that upon meeting appellant that night, appellant called him aside and confided to him that he had just "offed" a guy named Amos. Rucker testified that although he did not believe appellant at first, he came to believe him when he noticed blood spots on appellant's shoes and when he accompanied appellant for a drive shortly thereafter in the victim's car. After dropping Rucker off very late in the evening, appellant returned to the cemetery, soaked the victim's body in gasoline and set it on fire.

The next day, appellant picked up Draper in the victim's car and together they returned to the trash bin near the cemetery. Their purpose was to retrieve the contents of the glove compartment and determine if there was anything of value to them. In the victim's wallet, they found a Mastercard and an AT & T telephone card, both in the victim's name. Appellant advised Draper that he knew a

7. According to Draper, this discussion included the following, "I'm already in a lot of trouble. I don't need no more trouble." Upon appropriate objection, this remark was stricken from the record.

8. Draper worked the midnight to 8:00 A.M. shift.

person, Ronald Rucker, who could help them make use of the credit cards. The pair then picked up Rucker and, after Rucker confirmed that the Mastercard was usable,[9] the trio drove to Atlantic City, with the intention of using the Mastercard to secure cash advances. Prior to the trip to Atlantic City, Rucker and Draper had never met each other.

Upon arriving in Atlantic City, the three attempted, without success, to secure cash advances with the Mastercard at various casinos. Later in the evening, appellant slipped away from his companions and, unbeknownst to them, secured two (2) one hundred dollar cash advances on the card. While at the casinos, Ronald Rucker used the AT & T telephone card to make various telephone calls. The next day, June 13, 1984, appellant used the Mastercard, by signing Norwood's name, to purchase two gold chains at a jewelry store in downtown Philadelphia.

The charred remains of Amos Norwood's body were found by a passerby on June 15, 1984. Despite the burning and extensive decomposition, it was possible to identify his body through his dental records. Because of incautious use of the AT & T telephone card, the ensuing investigation led police to Ronald Rucker and his sister, Renee. On July 18th and 19th, 1984, Ronald Rucker gave two statements to police implicating appellant and Marc Draper. Although Rucker told appellant he was interviewed by the police, he did not tell appellant how deeply he had implicated him during the police interviews.

In any event, on July 19, 1984, shortly after Rucker's second interview with the police, appellant and Rucker took a train to New York and from there they took a cross country bus, with California as their intended destination. Throughout the journey, the two made frequent phone calls home to determine the status of the ongoing investigation.

On July 20, 1984, Marc Draper, based on Ronald Rucker's statement to the police, was arrested and charged with homicide. Draper, the son of a Philadelphia policeman,

9. Rucker was employed by a restaurant and was familiar with the procedure utilized to detect stolen credit cards.

made a full confession, describing his own role in the murder and appellant's role in the killing and aftermath.[10] On the same date, an arrest and search warrant was issued on appellant. As a result thereof, a search was conducted at appellant's residence. The search uncovered a blue jacket found in a box in appellant's bedroom. The jacket was later identified as belonging to Amos Norwood.

On July 21, 1984, after failing to locate appellant in Philadelphia, the police, through the National Crime Information Center, issued a "wanted message" regarding appellant to all police departments throughout the country. The next day, through a telephone conversation with his girlfriend, appellant discovered that there was an outstanding warrant for his arrest. On July 23, 1984, appellant returned to Philadelphia and surrendered himself to police at the office of an attorney.

Although Marc Draper was held in protective custody, appellant was able to speak with him and forward to him a series of four letters suggesting that Draper retract his prior statement and instead study and adopt the "story" contained in the letters, which "story" would exonerate appellant. Draper instead turned over the letters to the Commonwealth and they were introduced into evidence against appellant.

On appeal to this Court, appellant raises five issues with respect to the guilt stage of his trial and nine issues with respect to the penalty stage. Preliminarily, however, it is required of this Court in cases in which the death penalty has been imposed to independently review the sufficiency of the evidence supporting an appellant's conviction. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26–27, n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

The test for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to

---

**10.** The day after the murder, appellant confided to Draper that he had returned to the scene of the murder and set the victim's body ablaze.

the verdict winner, the jury reasonably could have determined that all elements of the crime were established beyond a reasonable doubt. *See Commonwealth v. Syre,* 507 Pa. 299, 489 A.2d 1340 (1985), *cert. denied,* 480 U.S. 935, 107 S.Ct. 1577, 94 L.Ed.2d 768 (1987). In the instant case, the Commonwealth presented direct evidence from Marc Draper, appellant's longtime friend as to appellant's actions at the murder scene. This evidence was bolstered by Ronald Rucker's testimony that appellant had admitted to him his participation in the killing and the burning of the corpse. In addition, there was testimony from Mrs. Norwood placing appellant in the victim's company on the day of the murder and appellant's own testimony that he shared the proceeds of the robbery/murder, i.e. that he used the victim's Mastercard and car. Also, by way of physical evidence, there was testimony from Ronald Rucker about appellant's blood splattered shoes and testimony from the police regarding the recovery of the victim's jacket from appellant's bedroom. Finally, there were the four letters in appellant's own handwriting concocting a "story" which would exonerate appellant and implicate Michael Hopkins, a conveniently dead mutual friend of Draper and appellant.

Countervailing the overwhelming evidence of the Commonwealth was appellant's unsubstantiated testimony that Marc Draper and Michael Hopkins actually committed the murder and that appellant used the victim's car and Mastercard only because he thought they were the by-products of a robbery and not a murder. Also, the credibility of each of the witnesses testifying on appellant's behalf was seriously undermined on their respective cross-examinations. Especially damaging was the credibility gap created by appellant's testimony with regard to the four letters to Draper delineating the "story" to be used in Draper's proposed retraction. Appellant, after hearing testimony from a handwriting expert, admitted writing the letters but claimed that he was merely the stenographer for a story actually concocted by Draper. However, since the primary beneficiary of the "story" was appellant and his role as stenographer

was fraught with inconsistencies, including remarks supposedly attributable to Draper that are addressed to Draper himself, e.g., "Now listen Marc, we have to keep in touch," his testimony was not credible.

After reviewing the entire trial transcript, including the synopsis set forth above, it is clear that there was sufficient evidence presented for the jury to have determined that all elements of the crimes for which appellant was convicted were established beyond a reasonable doubt. See *Commonwealth v. Syre, id.*

■ Appellant's initial averment of error is that the trial court erred when it permitted the prosecution, on cross-examination of defense witness Porttie Robinson, to explore two homicides for which Robinson stood convicted but not yet sentenced. Robinson's testimony was to the effect that Draper, a prison mate of Robinson's, had told him that "another guy", other than appellant, had committed the murder with Draper. The prosecution brought out Robinson's homicides to establish that Robinson was biased against Draper because Draper's father, a police officer, had participated in the investigation leading to Robinson's homicide convictions. Testimony was adduced from the former prosecutor who handled the Robinson case that during discovery Draper's father's name was given to Robinson's attorney, as part of a list of officers involved in the investigation. Robinson denied knowing that Draper's father was involved in his case.

■ As a general rule, unsentenced convictions may not be used to impeach a witness. *See Commonwealth v. Zapata,* 455 Pa. 205, 314 A.2d 299 (1974). However, it is equally true that a party against whom a witness is called always has the right to show by cross-examination that a witness is biased or has an interest in the result of the trial. *See Commonwealth v. Cheatham,* 429 Pa. 198, 239 A.2d 293 (1968) and *Commonwealth v. Evans,* 511 Pa. 214, 512 A.2d 626 (1986). In the instant case, the introduction of Robinson's unsentenced convictions was relevant to show

Robinson's potential bias against Draper because of the activities of his police officer father. Since Robinson denied any knowledge that Draper's father was involved in his investigation, it was within the province of the jury to decide whether Robinson's testimony was tainted. See *Commonwealth v. Evans, id.,* 511 Pa. at 225, 512 A.2d 626.

■ Next, appellant contends that reversible error occurred when the prosecutor asked appellant, on cross-examination, whether he was a suspect in the death of one Donna Freedman, a case entirely unrelated to the Norwood murder. Appellant frames this issue by suggesting that "the prosecutor *informed* the jury that appellant was a suspect in the notorious slaying of Donna Freedman" (emphasis added). The reality, however, is that the death of Donna Freedman was first raised by appellant, in his direct testimony, by way of explaining why Draper could not tell the real story of the Norwood murder. In the scenario testified to by appellant on direct examination, since Michael Hopkins, appellant's deceased purported murderer of Norwood, and Draper murdered Donna Freedman, Draper could not implicate Hopkins in the Norwood murder for fear Hopkins would implicate him in the Freedman murder. On cross-examination, the prosecution was permitted, to a limited extent, to explore the Freedman murder to impeach appellant's scenario. When the prosecution asked appellant whether he·was a suspect in the Freedman case, objection was promptly made and sustained and the question was stricken. Accordingly, in no way whatsoever was the jury "informed" that appellant was a suspect in the Freedman murder. Indeed, the Freedman murder would never have been mentioned in the trial if not for appellant's own testimony. Moreover, the trial court, on numerous occasions throughout the trial and in its instructions, advised the jury that the questions asked by the respective attorneys were not testimony, only the answers adduced. Since there was no answer adduced with respect to whether appellant was a suspect in the Freedman murder and the

issue itself was raised first by appellant, his averment of error is without merit.

Appellant's remaining three averments of error in the guilt stage of his trial involve claims of ineffectiveness of his trial counsel. As a general principle, trial counsel is presumed to be effective and a defendant has the burden of proving otherwise. *See Commonwealth v. McNeil,* 506 Pa. 607, 487 A.2d 802 (1985). Moreover, to prevail on a claim of ineffectiveness, a defendant must demonstrate that the course followed by trial counsel was unreasonable, that another meritorious course was available and that defendant was prejudiced by counsel's ineffectiveness. *See Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967) and *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987).

Firstly, appellant claims his counsel was ineffective for failing to seek a jury instruction as to the possible effect any deals between Marc Draper and the Commonwealth may have had on Draper's credibility. Appellant, however, again misstates the record. The record shows that counsel, as part of his requested charges, sought cautionary instructions as to the reliability of the testimony of (1) an "informer-interested witness", (2) an "immunized witness" and (3) an "accomplice." Indeed, the trial court's instructions included the following, "In view of the evidence of Marc Draper's criminal involvement, you must regard him as an accomplice ... you should view the testimony of an accomplice with disfavor because it comes from a corrupt and polluted source." Moreover, from his opening statement throughout his cross examination of Draper to the closing argument, defense counsel consistently emphasized the benefits arising to Draper from cutting a "deal" with the Commonwealth, i.e. he was permitted to plead guilty to second degree murder and receive a sentence of life imprisonment rather than face a first degree murder charge and the possibility of the death penalty. Accordingly, counsel was not ineffective with respect to the impact of Draper's deal on his credibility.

■ Appellant's two other allegations of ineffectiveness are related in that they both involve the definition of reasonable doubt. Appellant objects to the trial court's definition of reasonable doubt as a "doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his own affairs." He also objects to his trial counsel's use of the analogy of purchasing a home while discussing reasonable doubt in his closing argument. Appellant's argument is that both definitions or descriptions are "future oriented" dealing with "uncertainty and risk taking," rather than a retrospective evaluation of past events. Although appellant's argument has some facile appeal, it is thoroughly specious. He emphasizes the time component of the analogies while their real point is the relationship or connection between the level or type of doubt and the need to hesitate before acting or, in the case of a jury, making an important decision.

Furthermore, the charge of the trial court and defense counsel's analogy of the purchase of the home are, in appellant's own words, "standard" and "garden variety" examples given to juries throughout the Commonwealth. Therefore, a failure to object to such a charge or the use of such an example can hardly be considered prejudicially ineffective. *See Commonwealth v. Pierce, id* and *Commonwealth v. Lawson*, 519 Pa. 504, 549 A.2d 107 (1988).

Appellant's remaining averments of error concern the penalty stage of his trial, during which the jury found no mitigating circumstances and two aggravating circumstances, namely, that the murder occurred during the commission of a felony (the robbery) and a prior significant history of violent crimes.

■ Three of appellant's averments of error in the penalty stage relate to appellant's age at the time he murdered Amos Norwood. Appellant's basic contention is that being only eighteen years and four months of age at the time of the murder is a *per se* mitigating circumstance. Appellant provides no legal authority for this proposition and this Court is not aware of any. In this Commonwealth, for

purposes of the Crimes Code, a person who has attained the age of eighteen is treated as an adult.[11] The jury in this case was made fully aware of appellant's age. Obviously, they did not consider it to be a mitigating circumstance. That was a decision wholly within their province and there is no legal or logical reason to overturn that decision.

Two other averments of error relate to the recent United States Supreme Court case of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), which held that a Maryland death penalty statute was unconstitutional because it required a jury to find mitigating circumstances pursuant only to a unanimous vote. However, our statute does not require unanimity in establishing mitigating circumstances. This topic was fully addressed in *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27 (1989) and appellant has not presented any argument not properly disposed of in that case. The trial court's instructions in the instant case were completely consistent with the statute and our decision in *Commonwealth v. Frey, id.*

Next, appellant urges that his judgment of sentence should be overturned because the prosecutor asked appellant on cross-examination whether he was a suspect in the murder of Donna Freedman. This issue was fully addressed previously in reference to the guilt stage of appellant. That discussion is equally applicable with respect to the penalty stage.

The three remaining averments of error are claims of ineffectiveness of trial counsel. The first claim is that trial counsel was ineffective for failing to object to the introduction by the Commonwealth of several misdemeanors in attempting to demonstrate appellant's prior significant history of violent felonies.[12] Factually, the prosecution introduced evidence, without objection, as to the facts surrounding appellant's convictions with regard to two prior violent episodes, namely, convictions relating to his invasion

11. 42 Pa.C.S. § 6302.
12. 42 Pa.C.S. § 9711(d)(9).

of the home of an elderly couple and his terrorization of the couple with a rifle and convictions relating to his murder of a man six months before the instant murder, with a baseball bat and butcher knife. The butcher knife was left imbedded in the victim's throat after he had been stabbed twenty times.

The relevant statute is 42 Pa.C.S. 9711(a)(2) which provides, *inter alia,* as follows:

> In the sentencing hearing, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e).

Pursuant to 42 Pa.C.S. § 9711(d)(9), the prosecutrix in the instant case revealed to the jury the violent felonies for which appellant had been convicted previously and as part of that description listed the misdemeanor convictions arising out of the same events, e.g. in connection with appellant's third degree murder charge he was also convicted of theft and possessing an instrument of crime. The Commonwealth, in presenting its argument for the death penalty, is permitted to examine the facts surrounding the convictions of the violent felonies. *Commonwealth v. Beasley,* 505 Pa. 279, 479 A.2d 460 (1984). In the instant case, the revelation of the misdemeanor convictions pales in comparison to the impact upon the jury of the more serious felony convictions. Thus, their revelation did not prejudice appellant's case and counsel was not ineffective for failing to object to them. *See Commonwealth v. Pierce, supra.*

Appellant also claims trial counsel was ineffective for failing to argue to the jury that the Commonwealth did not present evidence that appellant "committed a killing while in the perpetration of a felony,"[13] because there was no proof presented that appellant, rather than his co-brutalizer, Draper, landed the fatal blow. This argument, when

13. 42 Pa.C.S. § 9711(d)(6).

raised in the context of the penalty stage, does not even reach the level of speciousness; it is simply ludicrous. The very same jury, less than twenty-four hours before, had just convicted appellant of first degree murder. Appellant now urges that his trial counsel was ineffective for not suggesting to the jury that appellant had not been convicted for "killing" the victim. Counsel is not required to present such patently meritless arguments even when the only straws within appellant's reach are exceedingly slippery ones. *See Commonwealth ex rel. Washington v. Maroney, supra.*

Appellant's final averment of error is that trial counsel was ineffective for failing to investigate and present appellant's "good prison record" as a potential mitigating circumstance. While it is true that *any* fact or circumstance about the defendant may be presented to a jury as a potential mitigating factor, it is not the duty of a trial attorney to list for the defendant an exhaustive list of potential areas of mitigation; such a list would go on forever. The record in the instant case reveals that trial counsel, on a number of occasions, advised appellant that he should be prepared, in the event of his conviction, to supply counsel with factors about his life that could be seen as mitigating. Appellant failed to provide such information. Moreover, the alleged "good" record appellant now asserts is grounded in a letter dated April 13, 1987 from a corrections counselor at Huntingdon prison to appellant's appellate counsel. The letter, which addressed appellant's fourteen month stay at Huntingdon, can best be described as a lukewarm endorsement. While it notes that appellant exhibited a "cooperative attitude" in counselling sessions, it also reveals that his prior facility characterized his adjustment as "not being satisfactory at all times" and during his stay at Huntingdon, he received two conduct violations. Furthermore, if evidence of appellant's "good" prison record was introduced by trial counsel, the Commonwealth, in rebuttal, could have emphasized that during his stay at Huntingdon, appellant was passing notes to Marc Draper

for the purpose of suborning perjury. All in all, it is hard to see how the presentation of appellant's prison record, as a whole, would have helped his case. Accordingly, trial counsel was not ineffective for failing to investigate and present appellant's prison record. *See Commonwealth v. Pierce, supra.*

Finally, we address the proportionality of appellant's sentence. Based on our review of the statistical data provided by our administrative offices and because of the jury's finding of two aggravating circumstances and no mitigating circumstances, we conclude that the sentence of death was not disproportionate to the penalty imposed in similar cases. *See* 42 Pa.C.S. § 9711(h) and *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984) *cert. denied* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). The convictions and sentences imposed below are hereby affirmed.