**[J-97A-2016 and J-97B-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 668 CAP |
| | : | |
| Appellant | : | Appeal from the Order entered on |
| | : | 09/28/2012 in the Court of Common |
| | : | Pleas, Criminal Division of Philadelphia |
| v. | : | County at No. CP-51-CR-0823621- |
| | : | 1984, granting a Stay of Execution |
| | : | |
| TERRANCE WILLIAMS, | : | SUBMITTED: August 25, 2016 |
| | : | |
| Appellee | : | |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 669 CAP |
| | : | |
| Appellant | : | Appeal from the Order entered on |
| | : | 09/28/2012 in the Court of Common |
| | : | Pleas, Criminal Division of Philadelphia |
| v. | : | County at No. CP-51-CR-0823621-1984 |
| | : | |
| | : | SUBMITTED: August 25, 2016 |
| TERRANCE L. WILLIAMS, | : | |
| | : | |
| Appellee | : | |


## OPINION IN SUPPORT OF REVERSAL


**JUSTICE MUNDY**                                                 **DECIDED: August 22, 2017**

Because I believe Williams has not met the governmental interference exception

to the PCRA time-bar, I would vacate the PCRA court's order granting Williams a new

penalty phase hearing, and would reinstate Williams' sentence of death.

On June 11, 1984, Williams and Marc Draper, both 18 years old at the time,

murdered Amos Norwood. The facts presented at trial were summarized by this Court

in Williams' direct appeal. *See Commonwealth v. Williams*, 570 A.2d 75, 77-79 (Pa. 1990). Briefly, I recount the following pertinent facts from our previous opinion.

Early in the day on June 11, 1984, Williams and Draper were gambling when they ran out of money. Williams devised a plan to travel to Norwood's house to extort money from him. Williams spent 15-20 minutes inside Norwood's home while Draper waited nearby. Williams returned with ten dollars, crossing paths with Norwood's wife, Mamie Norwood, while exiting the house. Williams and Draper left Norwood's house and returned to a gambling game they had been participating in prior to traveling to Norwood's home.

Two or three hours later, Norwood was on his way to church when he passed through an intersection where Williams and Draper were standing. Williams flagged down Norwood, and got into Norwood's car and drove away with him. A few minutes later, the car returned to the intersection and picked up Draper. Before getting into the car, Williams alerted Draper of his plan to give Norwood false directions so they could rob him.

Williams rode in the passenger seat, Draper in the rear seat behind the driver. The pair gave Norwood false directions which led him to a dark secluded area near a cemetery. Draper grabbed Norwood from behind, and Williams ordered him out of the car. Norwood was led into the cemetery and forced to lie face down while Williams and Draper searched him, finding twenty dollars in his sock. While Norwood begged for his life, Williams and Draper tied his hands behind his back with his shirt, tied his legs together with his pants, and stuffed his socks into his mouth. Draper stayed with Norwood while Williams returned to Norwood's car. At that point, Draper had a foot on Norwood's back and was taunting him about liking boys. N.T., 1/22/86, at 813.

Williams retrieved a socket wrench and a tire iron from Norwood's car, and began repeatedly hitting Norwood in the back of the head with the tire iron. At Williams' prompting, Draper voluntarily began to strike Norwood in the head with the socket wrench. Williams and Draper continued the attack until they believed Norwood was dead. The pair then hid the body behind two tombstones, covering it with loose brush. Williams and Draper disposed of the contents of Norwood's glove compartment in a trash can, and left with Norwood's car. That night, Williams returned to the cemetery, soaked Norwood's body in gasoline, and set it on fire.

The next morning, Williams picked up Draper in Norwood's car and they returned to the cemetery to examine the contents of the glove compartment they had thrown in the trash can. In Norwood's wallet they found a Mastercard and an AT&T telephone card, both in Norwood's name. The pair then picked up Ronald Rucker, and the trio headed to Atlantic City, in Norwood's car. The Mastercard and AT&T card were used in Atlantic City.

Norwood's charred remains were found by a passerby on June 15, 1984. Draper was arrested on July 20, 1984, and after learning of his arrest warrant, Williams turned himself in on July 23, 1984.

Williams testified at trial and denied any participation in the murder of Norwood, or that he knew Norwood. Williams testified to being present in the car when Draper and an individual named Mike Hopkins[1] attacked Norwood. N.T., 1/27/86, at 1181-82. He testified that he got out of the vehicle and walked away when the attack started. *Id.* at 1183. Williams testified he met up with Draper later in the night and Draper told him they had just robbed Norwood and stolen his car. *Id.* at 1186.

---

[1] Williams testified that Michael Hopkins died in 1984. N.T., 1/27/86, at 1225.

On February 3, 1986, a jury convicted Williams of first-degree murder, criminal conspiracy, and robbery.[2] The penalty phase hearing commenced the same day, and the jury found two aggravating factors: (1) Williams committed the murder while perpetrating a felony, and (2) Williams had a significant history of felony convictions involving the use or threat of violence to the person.[3] The jury considered mitigating evidence but found no mitigating circumstances. On February 4, 1986, the jury returned a sentence of death, and on July 1, 1987, Williams was formally sentenced to death. On February 8, 1990, this Court affirmed Williams' sentence of death. *Williams*, 570 A.2d at 75. Williams did not seek certiorari.

Williams filed his first, timely, PCRA petition on March 24, 1995. A hearing was held on April 7-9, 13, 16-17, 1998. Williams abandoned his earlier claim that he did not know Norwood prior to the date of the murder, and presented several witnesses who testified to a homosexual relationship between Norwood and Williams. On October 20, 1998, the PCRA court denied Williams' PCRA petition. This Court affirmed. *Commonwealth v. Williams*, 863 A.2d 505 (Pa. 2004).

Williams filed two more PCRA petitions, which were dismissed by the PCRA court as untimely on February 18, 2005, and June 1, 2005, respectively. Those orders

---

[2] 18 Pa.C.S. §§ 2502(a), 903, and 3701, respectively.

[3] To support the second factor, the Commonwealth introduced evidence of Williams' conviction for burglarizing the home of Hilda and Donald Dorfman on December 24, 1982. N.T., 2/3/86, at 1821. In said incident, Williams robbed the victims, pointed a gun at Mrs. Dorfman, and fired a gun above the head of Mr. Dorfman. *Id.* at 1823. No one was injured. Williams was convicted of two counts of robbery, and one count each of burglary, simple assault, unauthorized use of an automobile, and conspiracy. *Id.* at 1821. The Commonwealth also introduced the evidence of Williams' murder of Herbert Hamilton on January 26, 1984. *Id.* at 1827. Hamilton died as a result of 20 stab wounds to the body and injuries to the head from a baseball bat. *Id.* Williams was convicted of third-degree murder, theft by unlawful taking, and possession of an instrument of a crime. *Id.* at 1827-28.

were each affirmed by this Court on appeal. *Commonwealth v. Williams*, 909 A.2d 297 (Pa. 2006) (per curiam); *Commonwealth v. Williams*, 962 A.2d 609 (Pa. 2009) (per curiam).

While Williams' third PCRA petition was pending, he filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254, which was denied by the District Court on December 19, 2005. The Third Circuit affirmed, and the United States Supreme Court denied *certiorari*.[4] *Williams v. Beard*, 637 F.3d 195, 238 (3d Cir. 2011), *cert. denied Williams v. Wetzel*, 133 S. Ct. 65 (2012). In its opinion, the Third Circuit reviewed Williams' ineffective assistance of counsel claim and agreed with this Court's conclusion that counsel's failure to present evidence of Williams' psychological issues and years of sexual abuse did not prejudice Williams. *Id.* at 234. It noted the mitigation evidence elicited on collateral review was sympathetic and portrayed "a much more complicated and troubled individual than the one depicted during the trial's penalty phase." *Id.* Nevertheless, the Third Circuit concluded this Court applied the *Strickland* test correctly, and a finding of prejudice was not warranted based on Williams' significant history of violent felony convictions, that this was not his first murder, and the brutal facts of Norwood's murder. *Id.* at 236-37.

On March 9, 2012, Williams filed his fourth, untimely, PCRA petition. The circumstances leading to Williams' fourth petition arose on January 9, 2012, when the Federal Community Defenders Office (FCDO) visited Draper at SCI-Frackville, where he was serving a life sentence for his role in the murder of Norwood.[5] Draper signed an

---

[4] The District Court denied Williams' petition but granted a certificate of appealability as to two issues. *Williams*, 637 F.3d at 198. The Third Circuit concluded the issues were without merit and affirmed. *Id.*

[5] Draper pled guilty to second-degree murder on February 21, 1986.

affidavit that day stating he told prosecutors on at least one occasion that Norwood was a homosexual and in a relationship with Williams. Aff. of Draper, 1/9/12, at 4. Draper claimed the prosecution did not want to hear that, and they wanted him to testify that the motive was robbery. *Id.* Draper signed a second affidavit on March 1, 2012, stating that on the night of Norwood's murder, Williams "snapped." Aff. of Draper, 3/1/12, at 7. Nothing in the second affidavit referenced a homosexual relationship between Williams and Norwood. Following the second affidavit, the FCDO filed the aforementioned fourth PCRA petition on March 9, 2012, on Williams' behalf. Therein, Williams asserted, *inter alia*, counsel was ineffective at the penalty phase for failing to put forth evidence to mitigate the Commonwealth's assertion that Williams grew up in a stable loving family,[6] that the Commonwealth suppressed evidence of promises made to witnesses to induce cooperation, and that his sentence of death must be vacated because his prior conviction is also invalid based on the promises made to Draper. PCRA Pet., 3/9/12, at 23, 32, 39 and 46.

On September 6, 2012, Williams filed a Motion for Discovery requesting the Commonwealth produce police homicide files and activity sheets from the Herbert Hamilton and Amos Norwood murders, as well as any reports or notes made concerning Draper, Reverend Poindexter, or Norwood's sexual relationship with Williams or any child under the age of 18. Mot. for Discovery, 9/6/12, at 5-6. On September 10, 2012, the PCRA court heard arguments on the pleadings to determine if Williams' PCRA petition warranted an evidentiary hearing. The PCRA court permitted Williams the opportunity to obtain any additional information from Draper by September

---

[6] At Williams' first PCRA hearing, he asserted a similar argument that counsel was ineffective for failing to present mitigating evidence, namely that Williams was sexually abused as a child and that he and Norwood engaged in a homosexual relationship.

13, 2012. Draper signed a third affidavit on September 11, 2012, stating the prosecutors and detectives he met with for trial preparation did not want him to testify about Williams' homosexual relationship with Norwood. Aff. of Draper, 9/11/12, at 7. He stated, "I specifically remember Detectives telling me that information I gave them was not credible. They did not want me to say the case involved a relationship. They wanted me to say it was only a robbery." *Id.* The PCRA court concluded there was enough evidence to warrant an evidentiary hearing, which it scheduled for September 20, 2012.

On September 18, 2012, the PCRA court ordered the Commonwealth to produce the trial files for the Hamilton and Norwood homicides prosecuted against Williams in 1985 and 1986, respectively. On September 22, 2012, the PCRA court ordered the Philadelphia Police Department files produced into discovery.

The PCRA hearing was held on September 20 and 24, 2012. The only two witnesses were Andrea Foulkes, the trial prosecutor in both homicide trials, and Draper, the key witness at both trials. On September 24, 2012, Williams filed a written motion, and on September 25, 2012, Williams made an oral motion to "conform the . . . proof to the evidence submitted at the hearing[.]" N.T., 9/25/12, at 51. The PCRA court granted Williams' motion. On September 28, 2012, Williams filed an Amendment and Supplement to Petition for Post-Conviction Relief asserting claims based on evidence contained in the Commonwealth's files.

That same day, after reviewing Williams' supplemental petition, the PCRA court granted Williams' fourth PCRA petition concluding Williams met the governmental interference exception[7] to the PCRA's timeliness requirement based on the

---

[7] The PCRA court found Williams had not satisfied the newly-discovered evidence exception.

Commonwealth's violation of *Brady v. Maryland*, 373 U.S. 83 (1963) for failing to turn over documents which would have exposed that Norwood may have been a "homosexual ephebophiliac.[8]" 42 Pa.C.S. § 9545(b)(1)(i); PCRA Ct. Op., 11/27/12, at 12-13. The PCRA court specifically found that "the Commonwealth suppressed multiple pieces of evidence, all of which shared a common feature: each strengthened the inference that Amos Norwood was sexually involved with boys around [Williams]' age at the time of his murder." PCRA Ct. Op., 11/27/12, at 12. The PCRA court found Williams only learned about this claim during the September 2012 evidentiary hearing, and could not have raised it sooner. *Id.* Relevant to this appeal, the three items of exculpatory evidence the PCRA court found were not discoverable by Williams due to governmental interference are the following.

First, a handwritten note by Then-Assistant District Attorney Foulkes, which was never turned over to the defense, regarding a conversation she had with an unnamed person from which she learned Norwood was accused by a parent of touching her son, R.H., at Norwood's church. *Id.* at 12 n.30. Second, a "sanitized" statement from Mrs. Norwood that stated she awoke one night at 2:00 a.m. to find a young male standing in her home.[9] *Id.* at 12 n.31. She stated Norwood woke her to ask her for money and then left with the male, which led her to believe the incident was a kidnapping. Her husband returned at 9:00 a.m. and asked her not to call the police. Third, a "sanitized" statement of Reverend Poindexter to police indicating that he believed Norwood may

---

[8] "'Ephebophilia' is the psychological term for the attraction of adults to adolescents. It derives from the root 'ephebe,' which means 'a young man.'" PCRA Ct. Op., 11/27/12, at 13 n.32 (quoting MERRIAM-WEBSTER, WEBSTER'S NEW ENCYCLOPEDIC DICTIONARY 610 (2002)).

[9] The PCRA court found the statements were "sanitized" to remove any reference to Norwood's sexual orientation.

have been a homosexual and that a parent had disclosed to him that Norwood had propositioned her 17-year-old son for sexual favors. *Id.*

The PCRA court concluded, "[t]he government's sanitization of Mamie Norwood's and Reverend Charles Poindexter's statements, and flat non-disclosure of information about Amos Norwood's sexual advances on [R.H.], interfered with [Williams] and his attorney learning that Mr. Norwood had engaged in sexually inappropriate behavior with teenage boys other than [Williams]." *Id.* at 15. Thus, the PCRA court concluded the withholding of this evidence resulted in the inability of Williams' attorney to "'discover or develop' a *Brady* claim rooted in information removed from the scrubbed statements." *Id.* The PCRA court denied all guilt phase issues, granted a stay of execution, vacated Williams' death sentence, and ordered a new penalty hearing.

On October 3, 2012, the Commonwealth appealed, arguing Williams' PCRA petition was untimely and did not meet the governmental interference exception to the PCRA's timeliness requirements. Alternatively, the Commonwealth argued that if the petition was deemed timely, Williams' *Brady* claim would be meritless as it would not have been reasonably likely to change the outcome, had no apparent exculpatory value, and had been known all along by Williams.

This Court filed an opinion vacating the PCRA court's order and reinstating Williams' sentence of death on December 15, 2014. *Williams*, 105 A.3d at 1236. On June 9, 2016, the United States Supreme Court granted certiorari, vacated this Court's judgment, and remanded the matter on due process grounds.[10] *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016). Thus, the Commonwealth's appeal from the PCRA court's September 28, 2012 order is before this Court a second time.

---

[10] The Supreme Court expressed no opinion on the merits analysis of this Court's prior opinion.

Our standard of review "is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error." *Commonwealth v. Busanet*, 54 A.3d 35, 45 (Pa. 2012) (citation omitted). A PCRA petition must "be filed within one year of the date the judgment becomes final[.]" 42 Pa.C.S. § 9545(b)(1). "[A] judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." *Id.* § 9545(b)(3). "This timeliness requirement is jurisdictional in nature, and a court may not address the merits of any claim raised unless the petition was timely filed or the petitioner proves that one of the three exceptions to the timeliness requirement applies." *Commonwealth v. Cox*, 146 A.3d 221, 227 (Pa. 2016) (citing *Commonwealth v. Jones*, 54 A.3d 14, 16 (Pa. 2012)). Further, "a petition raising an exception to the one-year timeliness requirement must 'be filed within sixty days of the date the claim could have been presented' pursuant to 42 Pa.C.S. § 9545(b)(2)[.]" *Commonwealth v. Hackett*, 956 A.2d 978, 982 (Pa. 2008).

Instantly, there is no dispute that Williams' petition is untimely, as it was filed more than twenty years after his judgment of sentence became final. Therefore, Williams was required to prove one of the three timeliness exceptions to the PCRA applied.

The three timeliness exceptions to the PCRA are:

> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>
> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or

(iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa.C.S. § 9545(b)(1)(i)-(iii).

The PCRA court found Williams' petition satisfied the "governmental interference" exception.[11] *Id.* § 9545(b)(1)(i); PCRA Ct. Op., 11/27/12, at 14. Williams asserts that he exercised due diligence because Draper was unwilling to speak to anyone before January 9, 2012. Once Draper gave the January 9, 2012 affidavit, Williams met the jurisdiction requirement as his March 9, 2012 PCRA petition was filed within 60 days of Draper's January 9, 2012 affidavit.

In order to successfully plead governmental interference, an appellant must satisfy Section 9545(b)(1)(i) and show that the claim could not have been previously raised based on interference by government officials. "Although a *Brady* violation may fall within the governmental interference exception, the petitioner must plead and prove the failure to previously raise the claim was the result of interference by government officials, and the information could not have been obtained earlier with the exercise of due diligence." *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1268 (Pa. 2008). As the PCRA court correctly notes, "[w]hen a claim of governmental interference is rooted in the Commonwealth's failure to produce exculpatory evidence, [a PCRA petitioner] bears the burden to 'identify a specific claim that he was unable to discover or develop due to the District Attorney's conduct.'" PCRA Ct. Op., 11/27/12, at 14 (citing *Commonwealth v. Howard*, 788 A.2d 351, 355 (Pa. 2002) (internal citation omitted)). Therefore, before addressing the merits of Williams' *Brady* claim, it is first necessary to determine whether

---

[11] The PCRA court expressly found that governmental interference was the only timeliness exception that applied. PCRA Ct. Op., 11/27/12, at 11 n.28.

Williams exercised due diligence in presenting the claim that Norwood may have been a homosexual ephebophile.[12]

I note that no one has argued, or attempts to argue, that the governmental interference exception is met by merely asserting that the government withheld evidence. Such a standard would result in granting all PCRA claims of governmental interference when the appellant asserts a violation of *Brady* based on evidence withheld by the government, regardless of whether the substance of the alleged *Brady* evidence was already known to the appellant. The PCRA's timeliness requirement cannot be met by simply asserting a claim that the appellant did not know about the specific piece of evidence withheld by the government. Rather the withheld evidence must contain "information [that] could not have been obtained earlier with the exercise of due diligence." *Abu-Jamal*, 941 A.2d at 1268. Nevertheless, the OISA maintains all that is required is proof that the government withheld information - regardless of the substance of that information. Established law states that "a *Brady* claim may fall within the governmental interference exception[,]" *id.*, but by the dissent's interpretation a *Brady* claim pertaining to withheld evidence will always satisfy the governmental interference exception and bypass the PCRA's time bar.

The Commonwealth argues that not only did Williams fail to exercise due diligence, he "conclusively proved" he already knew of Norwood's "alleged sexual misconduct decades before he filed his untimely fourth PCRA petition."

---

[12] I disagree with the Opinion in Support of Affirmance (OISA)'s implication that Williams could not have ascertained the information necessary to form his *Brady* claim through the exercise of due diligence. OISA at 18 n.5. The test is not whether he could have discovered the specific evidence withheld, but rather if he could have discovered evidence to support a *Brady* claim that Norwood was a homosexual ephebophile. I maintain that Williams failed to exercise due diligence as illustrated by the evidence presented at the 1998 PCRA hearing.

Commonwealth's Brief at 27. The Commonwealth asserts Williams "was not entitled to circumvent the PCRA's filing deadline by reviving an old allegation against the victim based on new sources of previously-known information." *Id.* at 25.

Specifically, the Commonwealth notes that at trial the evidence demonstrated Williams had personal knowledge of Norwood's sexual orientation, and tried to extort Norwood by threatening to expose it. *Id.* at 29. It argues the evidence demonstrated that Draper taunted Norwood prior to the murder by stating "oh, you like boys." *Id.* Further, the Commonwealth notes that, in a pretrial statement dated July 18, 1984, Ronald Rucker averred Williams had described Norwood to him as a homosexual, stating he "'had been with [Norwood] before' in exchange for money." *Id.* Accordingly, the Commonwealth argues that "a claim that Norwood was homosexual and may have had sexual encounters with male teenagers 'could have been presented' much sooner than [Williams'] fourth PCRA petition in 2012[.]" *Id.*

The Commonwealth argues that Williams "actually did present such a claim at the proceedings on his first PCRA petition in 1998[,]" noting Williams' current attorneys argued to the PCRA court that Norwood "molested young boys." *Id.* (emphasis removed) (citing N.T., 4/8/98, at 235). The Commonwealth points to the 1998 PCRA hearing, where Williams presented several witnesses to testify that he was a victim of sexual abuse throughout his childhood, and that Williams had a sexual relationship with Norwood.

Williams asserts the PCRA court correctly determined he had proven the governmental interference exception to the PCRA's timeliness requirement. As noted, in addition to the due diligence requirement, the PCRA requires a petitioner to file a PCRA petition within 60 days of discovering a timeliness excepted claim. 42 Pa.C.S. § 9545(b)(2). Williams asserts the triggering date for filing his fourth PCRA petition was

the affidavit of Draper signed on January 9, 2012.  Williams notes he filed his PCRA petition on March 9, 2012, exactly 60 days from the date of Draper's affidavit, and therefore it was timely.[13]

---

[13]  I would be remiss if I failed to note that upon inspection of the certified record, a declaration of Reverend Poindexter from February 9, 2011, disclosed the information upon which the very claims subject to this appeal are based.  The declaration stated that he suspected Norwood's death may have been related to his relationship with young men. Dec. of Poindexter, 2/9/11, at ¶ 10.  The declaration also states that Mamie Norwood disclosed to him that sometimes young men would show up at their house looking for Norwood, and that Norwood would go missing for periods of time.  *Id.*  He further stated that he learned Norwood was spending time at a house or apartment in Center City with gay men.  *Id.* at ¶ 11.  Finally, the declaration states that Poindexter was approached by a mother of a 15-year-old boy at St. Luke's who alleged Norwood inappropriately touched her son and other boys at the church.  *Id.* at ¶ 15.  Importantly, unlike Draper's declaration, Reverend Poindexter's declaration does not indicate he was unwilling to speak with anyone prior to the date of the declaration.

Williams' March 9, 2012 PCRA petition references the declaration made by Reverend Poindexter in support of his argument that Poindexter "thought for years that Norwood lived a double life as a closeted homosexual; that Norwood's close mentoring relationships with troubled young boys were a source of suspicion and rumors in the church; and that parents of boys involved in youth activities with Norwood complained to Reverend Poindexter about Norwood molesting their sons."  PCRA Pet., 3/9/12, at 14. Attached to the PCRA petition is an Appendix containing several witness declarations, including Reverend Poindexter's.  Curiously, the table of contents dates the report as February 9, 2012, but the actual document is signed and dated by Reverend Poindexter with the signature "Charles Poindexter, 2/9/11[.]"  PCRA Pet. App., 7/16/12, at Tab 10. Reverend Poindexter's declaration includes all three points of evidence at issue now.  If the declaration was in fact given on February 9, 2011, Williams only had until April 11, 2011 to file his PCRA petition asserting said claims.

It appears likely that the 2011 date was discovered in preparation of the petition, and is bolstered by the fact that Williams' PCRA petition never cites the date of the Poindexter declaration despite multiple references to it, and instead, repeatedly refers to it as a "recent declaration" or "Poindexter Declaration."  *See* PCRA Pet., 3/9/12, at 14-15, 19, and 33.  However, the dates of all other declarations and affidavits are included in the citations to each document.

Williams asserts he met the governmental interference exception as he filed his petition within 60 days of Marc Draper's January 9, 2012 declaration.  *Id.* at 21-22, ns. Any reference to Reverend Poindexter's declaration is omitted from the timeliness discussion.  Additionally, Williams never explains why Reverend Poindexter's (continued…)

Upon review of the certified record and the relevant case law, I conclude that Williams failed to meet his burden under the governmental interference exception to the PCRA's timeliness requirement. The three pieces of evidence the PCRA court concluded violated *Brady* contained allegations of Norwood's alleged sexual orientation and homosexual ephebophilia. Evidence was presented at Williams' 1986 trial, 1998 PCRA hearing, and in his 2005 federal habeas petition claiming these same allegations. I agree with the Commonwealth's assertion that Williams knew of Norwood's alleged homosexual ephebophilia, not just Norwood's sexual orientation, even before the Poindexter and Draper declarations.

At trial in 1986, Draper testified he participated in the murder of Norwood, and he and Williams acted together. N.T., 1/22/86, at 657. On the night of the murder, Williams indicated to Draper that he could obtain money from Norwood by threatening to reveal Norwood's homosexuality to Norwood's wife. *Id.* at 667-68. On cross-examination, Draper testified that when Williams went to the car to get the tire iron and wrench he was standing over Norwood and taunting him by saying "oh, you like boys." *Id.* at 813. Draper stated, he was taunting him because Williams had told him that Norwood was a homosexual. *Id.* Accordingly, at the time of trial, testimony referencing

---

(…continued)
information was undiscoverable prior to Draper's declaration. Draper's declarations never mention Reverend Poindexter, nor do they assert a basis for Norwood's alleged homosexual ephebophilia. Based on the record evidence of Poindexter's February 9, 2011 signed declaration, and the further lack of explanation regarding the ability to discover Reverend Poindexter's claim prior to Draper's declaration, we could conclude on these bases alone that Williams failed to assert a claim regarding Norwood's alleged homosexual ephebophilia within 60 days of discovering the claim. Nevertheless, there are implications that the interviews with prior witnesses commenced after Draper's first declaration on January 9, 2012. Thus, February 9, 2012 would be a more likely date for Reverend Poindexter's declaration. Accordingly, I do not base my decision on Williams' failure to file a PCRA petition within 60 days of February 9, 2011, the date on Reverend Poindexter's declaration.

Norwood's alleged homosexual contact with Williams was known by Williams, and Williams was not precluded from presenting a claim regarding Norwood's alleged sexual orientation and proclivity for teenage boys.

In fact, Williams did present this argument at the 1998 PCRA hearing. Williams first presented three experts who evaluated him and concluded his mental state was affected based on a history of physical and sexual abuse and anger regarding his sexuality. The defense called Dr. Julie Kessel, an expert in forensic psychiatry who conducted a forensic mental health evaluation of Williams. N.T., 4/8/98, at 40. Williams indicated to her that he was sexually assaulted when he was about 5 or 6 years old by a friend who was 10 or 11. *Id.* at 64. He also reported a relationship with a male teacher who sexually molested him on several occasions. *Id.* Williams told Dr. Kessler this caused him to develop feelings of rage towards males who made him feel sexual or behaved sexually towards him. *Id.* at 66. Williams alluded to sexual relationships with several other men but he was not forthcoming about them. *Id.* at 72. In regard to the Hamilton murder, Dr. Kessel testified there was evidence of a homosexual relationship between Williams and Hamilton. *Id.* at 77. In reviewing the Hamilton file, Dr. Kessler testified there was evidence that suggested Williams was engaged in a homosexual prostitution ring. Further, Dr. Kessel testified that at the time of the Norwood murder, she believes Williams' murder of Hamilton made him less able to appreciate what he was doing to Norwood. *Id.* at 115. Dr. Kessler testified that, if there was a sexual component to Williams' relationship with Norwood, it would have "substantially contribute[d] to a reduction in his ability to control his impulses around somebody who would make or whom he would interpret to make an advance." *Id.* at 159.

Dr. Patricia Fleming, a clinical psychologist, reviewed Williams' file and interviewed him. She testified that the subsequent burning of the body indicated to her

this was not just a robbery, but a crime of rage. N.T., 4/9/98, at 361. She testified that Williams and Draper were threatening to expose Norwood's homosexuality, and that it likely contributed to Williams' motive. *Id.*

Dr. Ralph Kaufman, a psychiatrist in private practice conducted three separate clinical interviews of Williams. N.T., 4/13/98, at 519. In his final interview with Dr. Kaufman, Williams admitted to murdering Norwood. *Id.* at 542. Dr. Kaufman testified that Williams implied the motive for murdering Norwood was his anger over being abused by Norwood. *Id.* at 569.

Additionally, despite the PCRA court's assertion that Williams was unable to elicit testimony about Norwood's alleged homosexual ephebophilia at the 1998 PCRA hearing, and that he was "stifled in his presentation of that evidence by the Commonwealth's steadfast representation that there was no such evidence," Williams presented the testimony of several witnesses who testified to their knowledge of Norwood's alleged homosexual ephebophilia. PCRA Ct. Op., 11/27/12, at 21.

James Villarreal, a former teacher, coach, and mentor to Williams, testified that Norwood had a reputation for molesting young boys. N.T., 4/8/98, at 208, 227. He testified to learning this through his employment in the school system, and named a Mrs. Locket and Timothy Collins as sources of his information. *Id.* Villarreal testified he wasn't disputing the evidence of the murder and robbery, but that the motivation may have had a homosexual element. *Id.* at 234. During Villarreal's testimony, the PCRA court asked the defense if they were trying to prove that Amos Norwood molested young boys, to which defense counsel replied "we are trying to, as best we can."[14] *Id.* at

---

[14] The OISA asserts that the Commonwealth falsely represented to the PCRA court that no evidence of Norwood's homosexual ephebophilia existed. However, the exact exchange between the PCRA court and the Commonwealth was as follows.

(continued…)

235. Further, the PCRA court asked Villarreal if he was ever contacted by Williams' defense attorney, to which he replied "No." *Id.* at 240. The PCRA Court then asked, "[h]ad you been contacted by [Williams'] defense attorney or by an investigator or by someone else working for the defense attorney you would have spoken to that person freely?" *Id.* Villarreal indicated that he would have spoken freely and given the same testimony. *Id.*

Finally, Donald Fisher, a childhood friend of Williams who was in a sexual relationship with him for four or five years, testified. N.T., 4/13/98, at 596. Fisher indicated there was a sexual relationship between Williams and Draper, and a sexual relationship between Williams and Norwood. *Id.* at 600, 605. Fisher claimed to have knowledge that Williams performed sexual favors for Norwood in exchange for "money and, you know, beer and stuff." *Id.* at 618. He also testified that Norwood "was very

---

(…continued)

The Commonwealth: Well, Your Honor, I was only going to remind the Court that, in fact, there was evidence that this defendant knew some sort of dark secret about Mr. Norwood, because this case began as an extortion. He suggested to this co-defendant they knew - - that he knew something about Mr. Norwood which would enable them to extort money from Mr. Norwood and Mr. Norwood - -

The Court: But there is nothing in this case involving Norwood's homosexuality or violation of young boys - -

The Commonwealth: Well, that was the secret.

The Court: -- that accrued that was involved

The Commonwealth: Oh, no, just that [Williams] knew about Norwood's behavior and was trying to extort money from it. It didn't work so it moved on to robbery and murder, so it was not a secret. It was not a secret to anyone at the time.

The Court: You may proceed.

N.T., 4/8/98, at 237. Contrary to the OISA, the Commonwealth never asserted to the PCRA court that no evidence existed. Rather, the Commonwealth stated no evidence was presented at trial, a fact that is not in dispute.

degrading and he liked to have sex with kids[,]" which the Commonwealth objected to. *Id.* at 602. The PCRA court indicated it was going to allow the testimony to come in to show what was available, but clarified "whether what was available to trial counsel would have been admissible at trial or what impact it would have on trial are matters for argument."[15] *Id.* at 603.

Additionally, in 2005, in its review of the lengthy procedural history of this matter, the Third Circuit noted that the penalty phase was brief, but that at the 1998 PCRA hearing "a very different picture of Williams emerged." *Williams*, 637 F.3d at 229. The Third Circuit recounted the aforementioned evidence of Williams childhood "plagued by frequent physical and sexual abuse[,]" and his involvement in a sexual relationship with Norwood. *Id.*

Accordingly, the three pieces of evidence the PCRA court deemed the Commonwealth withheld, would only have been cumulative of the assertions Williams had already presented, i.e., that Norwood allegedly had homosexual relationships with teenage boys. The first piece of evidence, the handwritten note in the file never specifically mentioned Norwood by name and in vague terms referenced an incident

---

[15] The OISA characterizes this exchange as the PCRA court indicating it was not going to consider Fisher's testimony, and somehow also extends this to include Villarreal's testimony. However, the PCRA court merely stated that it could not consider the hearsay as fact. At the outset of Fisher's testimony, the PCRA court stated "I will not rely I don't expect no [sic] Court to rely on hearsay or just conclusions of this witness." N.T., 4/13/98, at 600. The Commonwealth objected to Fisher's testimony regarding Norwood's reputation, to which the Court responded, "Again, I will not consider it as a fact . . . There would have to be evidence of it . . . A statement by any witness of this nature doesn't have much credibility or impact. With that in mind, I'm going to accept it." *Id.* at 602-603. The PCRA court in 1998 accepted the testimony as evidence of what was available to the defense in its preparation of trial. For purposes of our review of Williams' due diligence, this Court is tasked with determining if evidence of Norwood's homosexual ephebophilia was ever presented. The statements of Villarreal and Fisher were as informative as those of Mrs. Norwood and Reverend Poindexter in their implications that Norwood had engaged in sexual acts with teenage boys.

with an individual at church, but stated it was never verified. Second, Mamie Norwood's statement made no indication that she knew of or believed the incident she witnessed was in any way related to her husband's sexual orientation. The statement only indicated that she believed it was a kidnapping. Finally, Reverend Poindexter's statement that Norwood may have been a homosexual was a fact that had been presented several times over the years, and his statement that he had received a complaint alleging an incident occurred with a male corroborated the information Williams already allegedly possessed, that Norwood engaged in homosexual relations with teenage boys. While this information certainly could have been used to portray Norwood in an unfavorable light to the jury, Williams was not precluded from doing so by governmental interference prior to 2012. *See Abu-Jamal*, 941 A.2d at 1269 (noting a PCRA timeliness exception does "not contain the same requirements as a *Brady* claim, . . . the exception merely requires that the facts upon which such a claim is predicated must not have been known to appellant, nor could they have been ascertained by due diligence[]") (internal quotations omitted).[16] *See also Commonwealth v. Morris*, 822 A.2d 684, 698 (Pa. 2003) (holding information that was clearly available to [the a]ppellant at the time of trial cannot be cloaked as a claim of governmental interference to circumvent the PCRA timeliness requirements).

Williams made a strategic decision to proceed to trial claiming he did not know Norwood and did not participate in the murder. Williams' decision to pursue an inaccurate factual recitation for the jury prevented him from exposing a motive based on

---

[16] *Abu-Jamal* addressed the appellant's reasoning in light of both the newly discovered fact and governmental interference PCRA timeliness exceptions. The Court's focus was on the newly-discovered evidence exception; however, the reasoning necessary to overcome the jurisdictional requirement applies equally to the governmental interference exception.

his sexual interactions with Norwood. At a minimum, Williams was in possession of his own knowledge that Norwood had paid him for sexual favors and that the two had a history of homosexual relations. Williams knew of Norwood's proclivity for engaging in sex acts with teenage boys as early as trial, and presented evidence of it throughout the subsequent proceedings. Williams explicitly acknowledged at the 1998 PCRA hearing that he was advancing a claim that Norwood was a homosexual ephebophile. N.T., 4/8/98, at 235. He cannot now claim governmental interference precluded him from discovering this claim regarding Norwood's character until Draper gave his affidavit, when he already asserted the very claim he now raises.[17]

Based on the foregoing analysis, and Williams' previous knowledge of Norwood's alleged homosexual ephebophilia, Williams has failed to meet the governmental interference exception to the PCRA's timeliness requirements.[18] This Court is not to view the evidence in isolation, but rather our task is to determine if Williams was unable to present his claim based on the government's interference, despite his own due diligence. For all the reasons set forth in this opinion, I cannot hold that the government's interference prevented Williams from presenting evidence of Norwood's alleged homosexual ephebophilia. As a result, the PCRA court was without jurisdiction to consider the merits of Williams' claim and thus, erred in vacating Williams' judgment of sentence and granting him a new penalty phase hearing. Accordingly, the PCRA court's September 28, 2012 order should be vacated, and Williams' sentence of death reinstated.

---

[17] It is unclear why Reverend Poindexter was not interviewed by the defense in preparation for the 1998 hearing as he was a witness at trial in 1986, who testified about his familiarity with Norwood through St. Luke's Church.

[18] Because Williams' petition failed to meet the governmental interference exception, I need not reach the merits of his *Brady* claim.

Justice Dougherty joins the Opinion In Support of Reversal.